## ROWOLDT v. PERFETTO, ACTING OFFICER IN CHARGE, IMMIGRATION AND NATU-RALIZATION SERVICE.

No. 5.   Argued November 13–14, 1956.—Restored to the calendar for reargument June 24, 1957.—Reargued October 14, 1957.—Decided December 9, 1957.

*David Rein* argued the cause on the original argument, and with *Joseph Forer* on the reargument, for petitioner. With them on the brief on the original argument was *Ann Fagan Ginger*.

*Carl H. Imlay* argued the cause on the original argument, and *Oscar H. Davis* on the reargument, for respondent. With *Mr. Imlay* on the briefs were *Solicitor General Rankin, Assistant Attorney General Olney* and *Beatrice Rosenberg. Mr. Davis* was also on the brief on the reargument.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner is an alien who has been ordered deported by virtue of § 22 of the Internal Security Act of 1950, 64 Stat. 987, 1006,[1] for past membership in the Communist Party. He attacks the judgment below on the ground—the only claim we need to consider—that he was not a "member" of the Communist Party within the scope of that section.

Petitioner is an alien who entered the United States in 1914 and, except for a short interval in Canada, has resided here continuously. The finding of "membership" by the hearing officer rested on petitioner's own testimony. He stated that he joined the Communist Party in "the spring or summer of 1935," paid dues,

---

[1] That section amended the Act of October 16, 1918, 40 Stat. 1012, as amended, to provide:

"[Sec. 1] That any alien who is a member of any one of the following classes shall be excluded from admission into the United States:

. . . . .

"(2) Aliens who, at any time, shall be or shall have been members of any of the following classes:

. . . . .

"(C) Aliens who are members of or affiliated with (i) the Communist Party of the United States . . . .

. . . . .

"SEC. 4. (a) Any alien who was at the time of entering the United States, or has been at any time thereafter, . . . a member of any one of the classes of aliens enumerated in section 1 (2) of this Act, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917. The provisions of this section shall be applicable to the classes of aliens mentioned in this Act, irrespective of the time of their entry into the United States."

The substance of the relevant portion of this provision was incorporated in the Immigration and Nationality Act of 1952, 66 Stat. 163, 205, 8 U. S. C. § 1251 (a) (6) (C).

attended meetings, and remained a member "until I got arrested [in deportation proceedings] and that was at the end of 1935. When I was arrested, I finished the Communist Party membership . . . ." At a later point in his testimony, petitioner stated that he was probably a member for approximately one year.

He then explained his reasons for joining the Communist Party:

> "The purpose was probably this—it seemed to me that it came hand in hand—the Communist Party and the fight for bread. It seemed to me like this—let's put it this way—that the Communist Party and the Workers' Alliance had one aim—to get something to eat for the people. I didn't know it was against the law for aliens to join the Communist Party and the Workers' Alliance. . . ."

In response to a question whether his joining the Communist Party was "motivated by dissatisfaction in living under a democracy," the following colloquy took place:

> "A. No, not by that. Just a matter of having no jobs at that time. Everybody around me had the idea that we had to fight for something to eat and clothes and shelter. We were not thinking then—anyways the fellows around me, of overthrowing anything. We wanted something to eat and something to crawl into.
>
> "Q. You say 'fight for something to eat and crawl into.' What do you mean by that term?
>
> "A. We had to go and ask those who had it—that was the courthouse at that time. We petitioned city, state and national government. We did and we succeeded. We finally got unemployment laws and a certain budget. Even at the few communist meetings I attended, nothing was ever said about over-

throwing anything. All they talked about was fighting for the daily needs. That is why we never thought much of joining those parties in those days."

The other activity bearing on petitioner's membership in the Communist Party was discussed in the following colloquy:

"Q. Were you an active worker in the Communist Party?

"A. The only active work I did was running the bookstore for a while.

.            .            .            .            .

"Q. What sort of bookstore was it?

"A. Oh, all kinds of literature—all kinds of writers in the whole world—Strachey, Marx, Lenin's writing and others. Socialism and all that stuff.

"Q. Did you own the bookstore?

"A. No. I didn't get a penny there.

"Q. What was the arrangement there?

"A. I was kind of a salesman in there, but the Communist Party ran it.

"Q. You secured this employment through your membership in the Communist Party?

"A. Yes.

"Q. Was this store an official outlet for communist literature?

"A. Yes."

Petitioner testified that he never advocated change of government by force or violence and he also gave his unilluminating understanding of, and beliefs about, the principles of communism. His account of the circumstances and motives that led him to join the Communist Party stood unchallenged and was evidently accepted at face value.

This testimony was all given during an examination of petitioner by the Immigration and Naturalization Service

in 1947. At the hearing below, in 1951, petitioner refused to answer whether he had ever been a member of the Communist Party on the ground that the answers might incriminate him. The hearing officer found, from the evidence in the record, that petitioner "was a member of the Communist Party of the United States in 1935." On appeal, to both the Assistant Commissioner, Adjudications Division of the Immigration and Naturalization Service, and subsequently the Board of Immigration Appeals, this finding was held supported by the record. Petitioner then sought a writ of habeas corpus from the District Court for the District of Minnesota. Both the District Court and, on appeal, the Court of Appeals for the Eighth Circuit held that the evidence produced at the hearing was sufficient to sustain the finding that petitioner was a "member" of the Communist Party. 228 F. 2d 109. As the case involves an application of *Galvan* v. *Press*, 347 U S. 522, we granted certiorari. 350 U. S. 993.

The authority for the order deporting petitioner derives from the Internal Security Act of 1950, as amended by the Act of March 28, 1951, 65 Stat. 28. As indicated, its evidentiary support rests entirely on petitioner's testimony before an immigration inspector in 1947. The transcript of that hearing was the foundation of the administrative proceedings that resulted in the order now under review. The adequacy of that testimony to sustain the order must be judged by the Internal Security Act of 1950, which was amended by § 1 of the Act of March 28, 1951, 65 Stat. 28, set forth in the margin.[2]

---

[2] *"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Attorney General is hereby authorized and directed to provide by regulations that the terms 'members of' and 'affiliated with' where used in the Act of October 16, 1918, as amended, shall include only membership or affiliation which is or was voluntary, and shall not include membership or affiliation which is or was solely (a) when under

As pointed out in *Galvan v. Press, supra,* at 527, the legislative history of this amendatory statute shows that the three specified qualifications are not to be applied as narrow exceptions but are to be considered as illustrative of the spirit in which the rigorous provisions regarding deportability of § 22 (2) are to be construed. There must be a substantial basis for finding that an alien committed himself to the Communist Party in consciousness that he was "joining an organization known as the Communist Party which operates as a distinct and active political organization . . . ." 347 U. S., at 528.

Bearing in mind the solidity of proof that is required for a judgment entailing the consequences of deportation, particularly in the case of an old man who has lived in this country for forty years, cf. *Ng Fung Ho* v. *White,* 259 U. S. 276, 284, we cannot say that the unchallenged account given by petitioner of his relations to the Communist Party establishes the kind of meaningful association required by the alleviating Amendment of 1951 as expounded by its sponsor, Senator McCarran, and his legislative collaborator, Senator Ferguson. (See 97 Cong. Rec. 2368 and 2387.) All that the Immigration authorities went on is what the petitioner himself said, for his truthfulness was not called into question. From his own testimony in 1947, which is all there is, the dominating impulse to his "affiliation" with the Communist Party may well have been wholly devoid of any "political" implications. To be sure, he was a "salesman" in a Communist book store, but he "didn't get a penny there."

sixteen years of age, (b) by operation of law, or (c) for purposes of obtaining employment, food rations, or other essentials of living, and where necessary for such purposes." See 16 Fed. Reg. 2907. These three exclusions from the substantive provision were, so far as deportations are concerned, repealed by the Immigration and Nationality Act of 1952, 66 Stat. 163, 280; however, as the text of this opinion makes clear, we are not deciding this case on the basis of (c), *supra.*

Presumably he had to live on something and further inquiry might have elicited that he was getting the necessities of life for his work in the book store. Nor is there a hint in the record that this was not a bona fide book shop.

Accordingly, we are of the opinion that the record before us is all too insubstantial to support the order of deportation. The differences on the facts between *Galvan* v. *Press, supra,* and this case are too obvious to be detailed.

*Judgment reversed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE BURTON, MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join, dissenting.

I regret my inability to join the Court's opinion, for its effort to find a way out from the rigors of a severe statute has alluring appeal. The difficulty is that in order to reach its result the Court has had to take impermissible liberties with the statute and the record upon which this case is based.

Section 22 of the Internal Security Act of 1950, under which these proceedings were brought, provides for the deportation of aliens who at the time of entry into the United States, or thereafter, were "members of or affiliated with . . . the Communist Party of the United States . . . ."[1] In this case there is no dispute that the petitioner was a dues-paying member of the Communist Party for about a year after he entered the United States. The Court, however, finds the record insufficient to establish that petitioner's membership was "the kind of meaningful association required by the alleviating Amendment of 1951," and suggests that "the dominating impulse to his 'affiliation' with the Communist Party may well have been wholly devoid of any 'political' implications."

---

[1] 64 Stat. 987, 1006, 1008.

This holding is derived from the Act of March 28, 1951, which amended the Internal Security Act by exempting from the broad sweep of the membership provision those persons who joined the Party "(a) when under sixteen years of age, (b) by operation of law, or (c) for purposes of obtaining employment, food rations, or other essentials of living, and where necessary for such purposes." [2] The Court does not rely here upon any of these exemptions as such, but rests its decision on its finding in *Galvan* v. *Press*, 347 U. S. 522, 527, that the legislative discussion of these exemptions indicates that the membership provision of the 1950 Act should be read benignly.

The Court's holding as to the insufficiency of this record may be interpreted in one of two ways, either (a) that petitioner was not shown to have joined the Communist Party conscious of its character as a political organization, or (b) that if he did so join, his membership was nonetheless excusable under the 1950 Act because it was predominantly motivated by economic necessity.

Under either view of the Court's opinion I think that the setting aside of this deportation order cannot be reconciled with the holding in *Galvan* v. *Press, supra.* There the Court, in rejecting the contention that the statute should be interpreted as not reaching persons who joined or remained members of the Communist Party without knowledge of its tenets of force and violence,[3] said, p. 528: "It is enough that the alien joined the Party, aware that he was joining an organization known as the Communist Party which operates as a distinct and active political organization, and that he did so of his own free will." I need not retrace the reasoning which

---

[2] 65 Stat. 28.

[3] "It must be concluded, therefore, that support, or even demonstrated knowledge, of the Communist Party's advocacy of violence was not intended to be a prerequisite to deportation." 347 U. S., at 528.

inescapably led the Court to that decision,[4] save to note one point not alluded to in the *Galvan* opinion, namely, that the ameliorating amendment of the 1951 Act, on whose "spirit" the Court here relies, was motivated solely by the problems of aliens who were being *excluded* from entry into the United States because they had joined totalitarian organizations in *foreign countries*.[5]

[4] The result reached in *Galvan* was thoroughly consistent both with the judicial and administrative decisions interpreting the predecessors of the 1950 Act, and with the purpose of that Act to "strengthen" the provisions of the law relating "to the exclusion and deportation . . . of subversive aliens." See H. R. Rep. No. 3112, 81st Cong., 2d Sess., p. 54. Compare the exhaustive treatment in *Latva* v. *Nicolls,* 106 F. Supp. 658, where Judge Wyzanski reached the same conclusion as to the meaning of the 1950 Act.

[5] This conclusion is compelled by the legislative history. The House of Representatives Report on the bill embodying the amendment stated:

"The attention of the Committees on the Judiciary of both Houses has been directed to the increasing number of cases in which nonimmigrant and immigrant *visas* have been withheld or *admission* into this country denied to aliens on the basis of regulations issued pursuant to the act of October 16, 1918, as amended. The majority of the cases brought to the attention of the committees involve spouses of servicemen, close relatives of American citizens, permanent residents previously admitted into the United States and returning from abroad to their unrelinquished domiciles with appropriate documentation, such as reentry permits, etc.

"The reason most frequently given for the denial of *visas* or the denial of *admission* appears to be the applicant's past membership of [*sic*], or affiliation with, certain totalitarian youth, national labor, or professional student, or similar organizations, or the alien's service in the German or Italian Armies, or his involuntary membership in totalitarian parties or their affiliates and auxiliaries, including those cases where it was shown that such membership or affiliation occurred by operation of law or edict, or for purposes of obtaining or preserving employment, food rations, or other essentials of living.

.        .        .        .        .

"The bill makes clear the intent of Congress that aliens who are, or were, voluntary members of . . . totalitarian parties or organizations are to be *excluded*, but aliens who were involuntary mem-

Under the first possible view of the Court's opinion it is plain that the petitioner is deportable, for in my judgment the record leaves no room for the conclusion that he was

bers . . . are not to be considered ipso facto as members of, or affiliated with, the . . . organizations within the meaning of the act of October 16, 1918, as amended." H. R. Rep. No. 118, 82d Cong., 1st Sess., pp. 1–2. (Italics added.)

The debates on the floor of both Houses of Congress provide additional evidence on this score. In the Senate, where the major discussion took place, every specific reference to the scope of the proposed amendment discloses that its purpose was to assist individuals who were being denied *admission* into the United States because of their prior membership in totalitarian organizations in their homeland. For example, Senator Smith inquired at one point: "Would the pending bill exclude, for instance, a Ukrainian who lived in the Soviet Union and who was forced to belong to a Kulak farm cooperative in order to obtain work? Would such a man be excluded?" 97 Cong. Rec. 2369. And Senator McCarran, the chief author of the amendment, described its three subsections in revealing detail. With respect to each he emphasized that many "spouses of members of the United States Armed Forces" were included. The first class, he said, consisted of persons "who during infancy where [*sic*] members of the Hitler Youth, Fascist Youth, and similar organizations where the child's education and welfare were made dependent upon membership . . . ." The second class embraced "aliens who unwittingly, and without their knowledge or consent, were impressed into the various labor fronts and professional unions and organizations; aliens who served in the German and Italian Armies; and aliens who . . . by law or decree became members of or affiliated with subsidiary totalitarian organizations." And the third class, as described by Senator McCarran, consisted of "aliens who were forced to become members of totalitarian organizations in order to obtain food ration cards, housing, employment, and other essentials of living." 97 Cong. Rec. 2370–2371.

The inference that Congress intended to aid only persons being denied admission to the United States rather than persons subject to deportation for membership which took place in this country is substantially reinforced by the fact that when the Immigration and Nationality Act of 1952 repealed the ameliorating amendment, 66 Stat. 163, 280, its substance was re-enacted as far as exclusions were concerned, 66 Stat. 186, but *not* with respect to deportation.

unaware that the Communist Party was "a distinct and active political organization." The petitioner has freely admitted that he was a member of the Party for about a year; that he paid Party dues; that he attended Party meetings; and that he worked, without pay, in the Party bookstore, which he recognized as "an official outlet for communist literature." Beyond this, petitioner's testimony betrayed considerable, albeit rudimentary, knowledge of Communist history and philosophy. To be sure, he disclaimed belief in the forcible overthrow of government, but that, as *Galvan* holds, is immaterial under this statute.

Perhaps it should be added that I do not understand the Court to suggest that, although petitioner joined the Communist Party aware that it was a political organization, his activities in the Party were too slight to constitute him a "member" within the meaning of the 1950 Act. The Court's reaffirmation of the *Galvan* definition of membership would seem to preclude such an interpretation of the opinion. Moreover, that interpretation would do violence to the sweeping and unequivocal language of the Act itself.

The Court says that the "differences on the facts between *Galvan* v. *Press* . . . and this case are too obvious to be detailed." But, in respect to the crucial question whether conscious membership in the Communist Party as a political organization was sufficiently shown, I submit that this record is at least as strong as that in *Galvan*. A "detailing" of the record before us will demonstrate this, and I have therefore liberally quoted from it in the Appendix to this opinion, *post,* p. 127.

The second possible ground of the Court's decision is equally foreclosed by *Galvan*. For if the record shows, as I believe it plainly does, that the petitioner joined the Communist Party of the United States of his own free will, and knowing it to be "a distinct and active political

organization," the 1950 Act makes his economic motives for joining just as irrelevant as the absence of proof that he did not believe in the violent overthrow of government.

The Court's action in this case calls to mind what Mr. Justice Cardozo said in *Anderson* v. *Wilson,* 289 U. S. 20, 27: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." Again, with specific reference to the statute here involved, this Court said in *Galvan,* p. 528: "A fair reading of the legislation requires that this scope [see *ante,* p. 122] be given to what Congress enacted in 1950, however severe the consequences and whatever view one may have of the wisdom of the means which Congress employed to meet its desired end." I fear that the Court has departed from those wise precepts in this instance.

My view of this case would require us to deal with petitioner's contention that the statute, as applied to him, is unconstitutional. Since the Court does not reach that question, no extended discussion of it seems appropriate in a dissenting opinion. It is enough to say that I regard petitioner's constitutional argument foreclosed by *Galvan* v. *Press, supra, Harisiades* v. *Shaughnessy,* 342 U. S. 580, and by the considerations and long line of authorities to which those cases refer. Whatever may be the scope of the limitations of the Fifth Amendment upon the deportation power (see *Galvan,* at pp. 530–531)—a question as to which I reserve the right to speak when occasion arises—I think that there is no constitutional bar to the statute as applied in this case.

For the foregoing reasons I would affirm the judgment below.

APPENDIX TO OPINION OF MR. JUSTICE
HARLAN, DISSENTING.

EXCERPTS FROM THE RECORD.

After being warned of his rights, petitioner went on
to say:

> "I told you just now. I don't want to give testi-
> mony whatsoever on that Communist stuff again.
> That is finished for me as far as I am concerned. I
> am telling you that I have been working here 32
> years—since 1914, and you can ask me what kind of
> work you are doing, how much wages you are getting,
> does your boss like you, but I don't want to be asked
> anything else about politics because I am not inter-
> ested. I am too old to be interested. I am not
> interested whether the Republicans get in office, or
> the Democrats, or the Communists, or the Socialists.
> I do not want anything else to be asked because I
> don't want to be in this country. I am. just in this
> country for the people's benefit. I am working and
> paying taxes all the time for them. Why should I
> go through this and get trapped through your ques-
> tioning? I do not want to be asked anything about
> politics. It is 10 years ago now. I don't care what
> they have in their minds. I don't want to answer
> any trapping questions. If they don't want me in
> this country, they can take me and ship me any
> time."

Thereafter the following occurred, omitting certain por-
tions of the record of no significance here and the testi-
mony already quoted by the Court that related to peti-
tioner's disclaimer of belief in the forcible overthrow of
government:

> "Q. Are you a member of any organizations or
> societies of any kind at the present time?

"A. Yes, I belong to the A. F. L. Local No. 665, Miscellaneous Hotel & Restaurant Workers.

"Q. To what organizations have you belonged in the past?

"A. In the past, the Workers' Alliance, the Communist Party.

"Q. When did you join the Workers' Alliance?

"A. In the spring or summer of 1935, I joined both the Workers' Alliance and the Communist Party.

"Q. Where did you join these organizations?

"A. In Minneapolis.

"Q. Did you hold any office in either of these organizations?

"A. Not in the Communist Party but in the Workers' Alliance, I was on the Executive Board, and once in a while I was secretary for some local.

"Q. What—the purpose of your joining the Communist Party at that time?

"A. We had no books then, just paid dues, and somebody collected.

"Q. Did you carry a party dues book at that time?

"A. No, but in the Workers' Alliance we had dues books.

"Q. Did you carry a Communist Party card at that time?

"A. I don't think we had cards at all.

"Q. For how long were you a member of the Communist Party?

"A. From then on until I got arrested and that was at the end of 1935. When I was arrested, I finished the Communist Party membership, but I stayed in the Workers' Alliance.

.          .          .          .          .

"Q. What were your political beliefs at the time you joined the Communist Party?

"A. My political beliefs were always somewhat for the benefit of most of the people—always for the benefit to help most of the people.

"Q. Apparently you were a member of the Communist Party for approximately one year. Is that correct?

"A. Yes, probably something like that.

.    .    .    .    .

"Q. What is your opinion of a revolution, such as occurred in Russia when the Communists obtained power?

"A. What is my opinion of the Russian revolution—that is about it. As much as I know about it, the Russian revolution, in my opinion, is this. It seemed that at the end of the war of 1914, the Russian middle-class especially and the Russian soldiers were sick and tired of being double-crossed and betrayed by their generals and what not (they went in with the Germans). Russian soldiers spilled their blood running against the Germans without ammunition, and there was chaos in the country. I said middle-class—that they organized and succeeded in overthrowing that particular leadership which was headed by the Czar. But this is my opinion. This was under the leadership of Kerensky. Seemingly, Lenin and his followers which represented more the lower peasant and factory workers, were not satisfied with this set-up, and kept on working for another revolution which finally overthrew the whole upper class in the fall of 1918, and so divorced themselves for the first time in world's history, economically and politically, from the rest of the world. That is the way I see it. That is my opinion on that.

.    .    .    .    .

"Q. Do you feel that your beliefs in government have changed during the past ten years, that is, since

you terminated membership in the Communist Party?

"A. Yes, it has changed to that extent—that I began thinking for myself instead of following somebody else telling me things. I found that nothing can be broken over a knee, and that any government that exists today has a right to exist as it is—by the power of the majority of a nation's people. Nobody in the world can say there are no changes. We must always consider changes. They can be made when the people see that it is the right time for it, and at that time they will have their representatives which will take care of it. I am absolutely against sudden dictatorship and overthrow of government.

.      .      .      .      .

"Q. What is your opinion as to whether communism was the cause or outgrowth of the Russian revolution?

"A. Communism did not start the revolution. The middle-class started the revolution. Lenin got hold of it. Communism was the result of the revolution.

"Q. Were you an organizer for the Communist Party?

"A. No.

"Q. What is your personal belief as to the principles of communism?

"A. What is communism? That is a good question. My belief is a different thing than communism is. According to Marx and Lenin and as I have seen the Communists working, since I knew of them, they are aiming, more or less, with forever methods to set up an economic system to get the people out of a monopoly control on to their own economic feet. That is the way I see them working now."