**Frederick J. WILLIAMS, Plaintiff,**

**v.**

**Walter SAHLI, District Director of Immigration and Naturalization at Detroit, Michigan, Defendant.**

No. 18089.

United States District Court
E. D. Michigan, S. D.

Sept. 26, 1958.

Goodman, Crockett, Eden & Robb, George W. Crockett, Jr., Detroit, Mich., for plaintiff.

Fred W. Kaess, John Owen, Detroit, Mich., for defendant.

LEDERLE, Chief Judge.

This is a proceeding for judicial review of a final order of the Board of Immigration Appeals entered May 14, 1958 denying plaintiff's motion to set aside a final order of deportation and to permit application for suspension of deportation.

To quote Mr. Justice Whittaker, "This is a deportation case. It presents a narrow and vexing problem of statutory construction." Bonetti v. Rogers, 1958, 356 U.S. 691, 78 S.Ct. 976, 977, 2 L.Ed.2d 1087.

On or about May 17, 1954, the United States Immigration Service arrested the plaintiff on a warrant which alleged that plaintiff is an alien who last entered the United States at New York, New York on the 21st day of December, 1907 and that he has been, after entry "an alien who is affiliated with the Communist Party of the United States".

The respondent's predecessor conducted a hearing wherein he determined that the plaintiff was an alien subject to deportation under the Immigration and Nationality Act, 8 U.S.C.A. § 1101 et seq. An order of deportation was entered on July 23, 1954.

Plaintiff filed a complaint in this Court in which he sought to have the order of deportation set aside. The District Judge found the only issue involved to be the plaintiff's place of birth. He found that the Board's finding of alien-

age was based on substantial and probative evidence and dismissed the complaint. Williams v. Butterfield, D.C.1956, 145 F.Supp. 567.

The Court of Appeals for the 6th Circuit agreed with the District Judge that there was nothing involved except the place of birth of the plaintiff and affirmed the judgment. Williams v. Mulcahey, 1957, 250 F.2d 127.

An application for certiorari was denied by the Supreme Court on April 28, 1958. 356 U.S. 946, 78 S.Ct. 793, 2 L.Ed. 2d 821. An application by the petitioner for rehearing was filed with the Supreme Court on May 10, 1958.

On May 8, 1958 plaintiff filed a petition requesting that the final order of deportation be set aside for the purpose of permitting him to make application for the suspension of deportation. Section 1254(a) (5) of the Immigration and Nationality Act of 1952. He also requested permission to produce testimony in order to prepare a record in conformity with later decisions of the Supreme Court.

In his affidavit filed with his petition, he asserted that he had been informed by competent counsel that the evidence he could produce would be sufficient to warrant suspension of deportation. He further states that he had not heretofore applied for suspension of deportation, because of his honest belief that the final order of deportation was invalid; it had not been established that he was an alien. He conceded that this claim was foreclosed by the action of the Courts.

In the event the Board agreed to set aside the final order of deportation, the petitioner proposed to produce evidence which would justify findings as follows:

He became a member of the Communist Party while under the mistaken belief that he was a native-born citizen of the United States. As such, he believed that he had the rights of an American citizen, including the rights of freedom of thought and freedom of speech. Prior to the time that any question arose as to his place of birth, he had voluntarily dis-

associated himself from the Communist Party.

During the period that he was a member of the Communist Party, starting in the early 1930's, he honestly believed that the program of that organization, as set forth in its published platforms, offered the best solution to the economic ills which then beset the country.

He became a business agent of Local Union 208, UAW–CIO, and in conformity with the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., he filed an affidavit disclaiming membership in the Communist Party. At no time since executing that affidavit on August 8, 1950, has he been a member of the Communist Party. He gave the names of prominent civic leaders to whom he was well-known, and who would be willing and well qualified to testify as to his good reputation in the community in which he resided.

He further stated: "My deportation to Wales would result in exceptional and extremely unusual hardship to me, to my father, and to my American-born daughter and grandchildren. I have no known relatives nor do I know anyone in Wales. My father, now seventy-nine years old and my two brothers and four sisters all live in this country, as well as my daughter and my two very small granddaughters. I am fifty-two years old, and according to the proofs here, I have lived in this country since I was one year old. I own no property and have no resources aside from what I am able to earn as a carpenter. I have never been convicted of any offense, though I was arrested several times in the 1930's while on picket lines for my Union."

During the proceedings which resulted in the order of July 23, 1954, plaintiff was represented by competent attorneys, who likewise represent him in these proceedings. It appears obvious, that his election to contest the validity of this order solely on the basis of his claim that he was not an alien, was in conformity with the advice given by his attorneys.

The Board of Immigration Appeals declined to set aside the order of deporta-

tion in order to allow plaintiff to file an application for suspension of deportation and denied a hearing stating:

"It is the rule that an application for suspension of deportation must be submitted in the course of the deportation hearing. The respondent did not apply for such relief during the hearings (Matter of M——, 5 I. & N. Dec. 472).

"* * * An applicant for suspension of deportation who is charged with having been a member of a subversive organization is required to prove that he has not been a member of a subversive organization for ten years preceding his application for suspension of deportation. Obviously, the respondent cannot do this. No purpose would therefore be served in reopening proceedings to enable him to apply for suspension of deportation."

This Court has jurisdiction to review the action of the Board in refusing to open the deportation proceedings to permit this plaintiff to apply for suspension. Accardi v. Shaughnessy, 1953, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681; Ceballos v. Shaughnessy, 1957, 352 U.S. 599, 77 S.Ct. 545, 1 L.Ed.2d 583.

Defendant concedes, acting under delegated authority from the Attorney General, that the Board has the discretionary power to grant the plaintiff's application for suspension of deportation. Plaintiff claims this discretionary power was not exercised in this case, or, if it is assumed the order of May 14, 1958 purported to be an exercise of that discretion, it was arbitrary and capricious.

Prior Court proceedings have established that the plaintiff was brought to America by his parents while an infant. His parents never told him he was not born in America. His earliest recollections concerned his removal from the house in which he assumed he was born to another location. He entered the public schools at the age of six in Plymouth, Pennsylvania. Just prior to reaching his fourteenth birthday, his father told him he would have to go to work to help support a family of ten. By this time he had partially completed the eighth grade. After he went to work, he attended a continuation school part-time, until he was sixteen. At no time during his school years, did he remember anyone calling his attention to the United States Constitution, Declaration of Independence, Lincoln's Gettysburg Address or any of the other important documents relating to the virtues of our form of government. Indeed, he claimed he had no recollection of ever having been taught anything about our government. His reading never advanced beyond funny papers, the sport pages in the newspapers and books of the Horatio Alger type.

After he received his work permit, he worked long hours for small pay at various types of jobs available to a young boy. During his sixteenth year, he went to work in an iron works at what he called, "feeding; pouring scrap metal into the furnace". After a short time at this job, he went to work as a "nipper" in a mine. During his youth he spent his spare time having fun, not studying the philosophy of government. He has not traveled abroad, and has never visited Wales, where it is proposed that he be deported.

Like many other young people of his age, he joined the Communist Party during the dark days of the depression. It was also during this period that our government adopted many measures intended to ameliorate the hardships produced by the depression. At that time, many of our best citizens considered these measures as socialism and were deeply concerned about the future of our country. Many years ago, Jane Addams made the observation, "If the young people are not too progressive, the old people are sure to be too conservative."

During recent years we have learned much about Communism as it is practiced behind the iron curtain. We have

had an opportunity to observe the difference between theory and practice. Based on this after acquired knowledge, it is difficult to understand why the plaintiff did not abandon the Party long before he did. This may be partially accounted for by the human trait that causes all of us to be reluctant to abandon ideas acquired during our earlier years.

At his present age it would be difficult for the plaintiff to find new employment in America. If he is deported to a foreign land where he has no relatives, friends or acquaintances, it appears obvious that it would be still more difficult for him to earn a living during his declining years. The record indicates that the plaintiff had an honest belief that he was a native-born citizen. Whatever views he acquired as to the relative merits of different types of government came from our public school system, news media and contacts with native-born companions. It was but natural for him to assume he had the right of freedom of thought, freedom of expression and freedom of association. Had he been born a year later, he could not now be banished to a foreign land for exercising those rights.

Like many other judges, I find it difficult to reconcile some of the provisions of the Nationality Act with our American concepts of justice, fair play and the humane treatment of individuals.

Chief Justice Warren wrote: "Although not penal in character, deportation statutes as a practical matter may inflict 'the equivalent of banishment or exile' * * *." Barber v. Gonzales, 1954, 347 U.S. 637, 642, 74 S.Ct. 822, 825, 98 L.Ed. 1009.

In a similar case, Mr. Justice Whittaker, reviewing the harshness of our deportation procedure wrote:

"'It may fairly be said to be a presupposition of our law to resolve doubts * * * against the imposition of a harsher punishment.' * * * And we cannot 'assume that Congress meant to trench on (an alien's) freedom beyond that

which is required by the narrowest of several possible meanings of the words used.'" Bonetti v. Rogers, 1958, 356 U.S. 691, 78 S.Ct. 976, 981, 2 L.Ed.2d 1087.

I can understand Mr. Justice Harlan's feelings when in a dissenting opinion he stated:

"I regret my inability to join the Court's opinion, for its effort to find a way out from the rigors of a severe statute has alluring appeal. The difficulty is that in order to reach its result the Court has had to take impermissible liberties with the statute and the record upon which this case is based." Rowoldt v. Perfetto, 1957, 355 U.S. 115, 121, 78 S.Ct. 180, 184, 2 L.Ed.2d 140.

That portion of the statute allowing suspension of deportation requires, among other things, that petitioner "has not been served with a final order of deportation issued pursuant to this chapter in deportation proceedings up to the time of applying to the Attorney General for suspension of deportation". 8 U.S.C.A. § 1254(a) (5). It is conceded that the plaintiff did not apply for suspension during the four years the matter was pending in the courts.

In view of the fact the defendant concedes plaintiff left the Communist Party prior to 1950, one could conclude this was the kind of situation that prompted Congress to insert the humane provision in the Act authorizing the Attorney General to suspend deportation in cases of " * * * exceptional and extremely unusual hardship to the alien".

■■ This is a matter, however, that rests in the sound discretion of the Attorney General. He still has the authority to suspend deportation in this case.

■ Counsel for plaintiff attempted to explain his failure to comply with this provision on the ground, that in other cases, the Board had set aside the final order of deportation to allow petitioner to file an application for suspension.

Further, he pointed out that a strict interpretation of the statute requires that the application be filed during the hearings regardless of the basis upon which the proceedings were being contested.

The wisdom of this provision of the Act is not for the Courts to determine. The determination of the status of aliens within our jurisdiction is final with Congress, and this court will not pass " 'upon the wisdom, the policy, or the justice of the measures enacted by Congress in the exercise of the powers confided to it by the Constitution over this subject.' " Li Sing v. United States, 1900, 180 U.S. 486, 21 S.Ct. 449, 453, 45 L.Ed. 634. If the Act is to be changed, it must be changed by Congress. The plaintiff has failed to comply with the Act. It cannot be said that the Board's refusal to disregard this provision was an abuse of discretion. It therefore follows that the complaint must be dismissed.