MATTER OF C—

In DEPORTATION Proceedings

A-5542165

*Decided by Board May 10, 1962*

Evidence—Admissibility of statements for impeachment purposes—Demand for witness' statement must be timely made.

(1) Alleged statements by three individuals that Government witnesses were perjurers are not admissible in evidence for impeachment purposes since there is nothing to indicate that any of the three persons had knowledge of the *reputation* of the witnesses in the neighborhoods in which they lived.

(2) Since counsel made no demand for the statement of a Government witness during cross-examination in 1953 at which time existence of the statement was disclosed, he is not entitled, nine years later and after six hearing adjournments at his request, to production of the statement nor to further cross-examination of the witness.

(3) The record establishes, in this case, by reasonable, substantial and probative evidence that the respondent was, after entry, a member of the Communist Party of the United States as the word "member" has been judicially defined.

CHARGE:

Warrant: Act of October 16, 1918, as amended September 23, 1950 [40 Stat. 1012; 64 Stat. 1006; 8 U.S.C. 137-3, 1946 ed. Supp.]—After entry, member of Communist Party of United States.

BEFORE THE BOARD

DISCUSSION: The special inquiry officer's decision of October 10, 1961, contains a full summary of the proceedings in this case since its commencement on October 31, 1950. This need not be repeated here with the exception of a reference to a few matters. On September 4, 1953, we dismissed the respondent's appeal from an order of deportation entered by a special inquiry officer. The order of deportation was affirmed in *Carlisle* v. *Brownell*, 149 F. Supp. 855 (Dist. of Col., 1957). On appeal, the judgment of the district court was vacated and withdrawal of the order of deportation was directed without prejudice to further action by the Service. *Carlisle* v. *Rogers*, 262 F.2d 19 (C.A. D.C., 1958). The latter decision held that the special inquiry officer's refusal to order the production of a pre-hearing statement of witness H— was prejudicial error. On

650

April 28, 1959, we remanded the case to the Service for further proceedings. A further hearing was held, and the case is now before us on appeal from the special inquiry officer's order of October 10, 1961, directing the respondent's deportation.

The respondent is a 64-year-old male alien, native of England and British subject, whose last entry into the United States apparently occurred on or about June 18, 1920. He has resided in this country since about 1917. Counsel stated that the respondent married an American citizen but the record does not show whether this marriage is in existence at the present time. The special inquiry officer found that the respondent "was voluntarily a member of the Communist Party of the United States between 1933 and 1938, inclusive, and 1946 and 1947, inclusive." The sole issue to be determined is whether the respondent is deportable on the charge stated above.

We have carefully reviewed the entire record. J—L—L— testified that he was a member of the Communist Party of the United States from 1930 to 1937; that during 1933 he was a student in the Workers School at Hollywood, California, which was organized by the Communist Party to train a new layer of leadership for the Party; that the respondent was one of the instructors at this school; and that he had seen the respondent at meetings of the State Committee of the Communist Party and at various meetings of sections and subsections of the Party during 1934 and 1935. He stated that only members of the Communist Party were permitted to attend such meetings. He also testified that from 1934 until November 1936 his duties as an officer in the Los Angeles Section of the Party required the inspection once each year of Communist Party membership cards and the issuance of new cards to replace those for the previous year and that, in this connection, he saw the respondent's Communist Party membership card about November 1934 and November 1935.

L— testified that, in his capacity of Los Angeles County Organizational Secretary, and pursuant to a decision of the Section Committee, he assigned the respondent to represent the Communist Party in the American League Against War and Fascism late in 1933 or early in 1934; that this assignment continued for five or six months; and that, pursuant to a decision of the State Committee in June 1935, he assigned the respondent, who was then in Los Angeles, to report to San Francisco to become co-editor of the Communist newspaper on the West Coast—the Western Worker. L— was cross-examined at length by the respondent's former counsel.

N—H—'s original testimony appears at pages 671 to 681, and 687 to 742. On October 8, 1952, we directed that his testimony be taken de novo and his subsequent testimony appears at pages 779 to 922. He testified that he was a member of the Communist Party of the

651

United States from 1927 until 1939; that at San Francisco from April 1936 until August 1937 he was Labor Editor and later Managing Editor of the Western Worker, the West Coast publication of the Communist Party; that at the time the witness came to the Western Worker in April 1936 he was introduced to the respondent who was then Editor in Chief of that publication; and that the respondent remained as Editor in Chief for a period of approximately four to six months thereafter. H— identified the masthead of the Western Worker as it appeared in the issues of May 7, 1936 (Exh. 13) and May 14, 1936 (Exh. 14). The mastheads contain the statement "Western Organ of the Communist Party, U.S.A. (Section of the Communist International)." H— stated that he and the respondent attended staff meetings of the Western Worker; that all who attended these meetings were members of the Communist Party; and that, during the period that he (H—) was on the staff of the Western Worker, it was obligatory that all persons working for the newspaper be members of the Communist Party of the United States.

M—B— stated that he became a member of the Communist Party of the United States in New York City during the fall of 1936; that he came to California during January 1937; and that he was in the Hollywood Section of the Communist Party from that time until 1943 or 1944. He testified that he met the respondent in 1937 and during that year attended several closed meetings of the Communist Party at which the respondent was present. Only members of the Communist Party were permitted to attend these closed meetings.

R—M—H— stated that he was a member of the Communist Party of the United States for a short time in 1940; that he rejoined in 1943; that he retained his membership until 1947; and that during 1946 and 1947 he attended several closed meetings of the Communist Party which were restricted to members of the Party. He testified that he met the respondent in 1946 at a closed meeting of the Communist Party and saw him at several additional closed meetings of the Party during 1946 and 1947.

During the hearing in January 1953, witness H— was cross-examined at considerable length. At that time, counsel requested the production of a statement this witness had previously made to an officer of the Service concerning the respondent but the special inquiry officer denied the request. As we have indicated, the Court of Appeals in *Carlisle* v. *Rogers, supra*, held this was prejudicial error. At the reopened hearing on October 18, 1960, the statement made by H— on October 30, 1952, was made part of the record as Exhibit 23, and during July and August 1961 the witness was again questioned by counsel. His testimony at that time was substantially similar to the statements he had made on October 30, 1952, and his credibility was not impeached. On the contrary, the special inquiry

652

officer found the witness to be entirely convincing and credible. His testimony in 1961 was also similar to that given in January 1953.

When counsel filed the notice of appeal on October 18, 1961, he requested an extension of time within which to submit a written brief and he was granted until November 20, 1961. However, no brief was submitted. We have carefully considered counsel's contentions at the oral argument. The transcript of testimony comprises 1462 pages. During the oral argument, counsel made certain assertions as to what the record showed but in no instance did he furnish any page reference in support of his assertions.

With respect to two of the Government witnesses mentioned above, counsel alleged that H— and L— had reputations as perjurers; that H— had been called a perjurer by the hearing officer [Judge Sears] in the second Bridges case; that Dean Landis, the hearing officer in the first Bridges case, and a Congressional Committee had so characterized L—; and that counsel was not permitted to introduce these three statements at the original hearing [1950–1953] nor at the reopened hearing [1960–1961]. Since no brief was submitted, we believe that during the oral argument counsel should at least have furnished a specific reference and quotation of the exact statements which were supposed to have been made by Judge Sears, Dean Landis and the Congressional Committee rather than a mere assertion by counsel that these three sources had characterized H— and L—as perjurers. We note that no claim was made that Dean Landis had called L— a perjurer in counsel's undated memorandum of law which was submitted about March 24, 1961. On page 9 of that memorandum there is a purported quotation from the report of Dean Landis which refers to L—'s testimony in the Bridges case as being evasive and contradictory but there is nothing to indicate that Dean Landis had referred to L— as a perjurer.

Counsel did not furnish any reference to the pages of the transcript where the supposed attempts to introduce the three statements were made and rejected. As to H—, we have been unable to find any reference in the transcript concerning an attempt by counsel or former counsel to introduce the alleged statement of Judge Sears at any of the hearings. With regard to L—, it is true that counsel did attempt to introduce the statement of Dean Landis and a Congressman at the hearing on February 23, 1961, and that the special inquiry officer denied the offer of proof. However, we do not think there had been a previous attempt to offer these two statements. Apparently, what had occurred at the 1950–1953 hearings was that which was stated by former counsel at page 402 of the transcript. He there said that he had what purported to be a transcript of the report of Dean Landis in the Bridges case; that Landis in his report had summarized L—'s testimony before him; that L— had made

statements in this respondent's proceeding which were contradictory to what Landis stated L— had said before him; and that, when objection was made to using the report of Landis in that manner, counsel agreed that the proper procedure would be to show L— the contradictory statements in the transcript of the Bridges hearing. It was suggested to former counsel that he could apply for a copy of the pertinent part of the Bridges transcript under former Part 383, Title 8, Code of Federal Regulations, but he stated that the respondent would be unable to bear the expense involved and the Government declined to produce the transcript otherwise.

Counsel contends that what Judge Sears said about H—and what Dean Landis and the Congressman said about L— was admissible in this proceeding, and he cited as authority *Knode* v. *Williamson*, 84 U.S. 586 (1873); *Fletcher* v. *United States*, 235 U.S. 706, 42 App. D.C. 53 (1914); *Kidwell* v. *United States*, 38 App. D.C. 566, 573 (1912); *People* v. *Loris*, 115 N.Y. Supp. 236 (Sup. Ct., App. Div., 1909); *Swafford* v. *United States*, 25 F.2d 581 (C.C.A. 8, 1928); and *Foster* v. *United States*, 282 F.2d 222, 223 (C.A. 10, 1960).

The cases cited by counsel deal with the well-settled legal principle that one side may, for the purpose of impeachment, offer the testimony of a witness as to the reputation for truth and veracity of a witness on the other side. In such cases, the important consideration is not the personal opinion of the impeaching witness as to whether the other witness is or is not truthful but whether the latter witness has the *reputation* of being truthful or untruthful. Furthermore, in order to be competent to testify, the impeaching witness must have knowledge of the *reputation* of the other witness among persons living in the neighborhood of that witness. This is illustrated by *Fletcher* v. *United States*, *supra*, at pages 66–67. In that case, Lagier, a defense witness, testified that he had known Wilson, a Government witness, for about one and one-half years; that he knew other people who knew Wilson; and that Wilson's general reputation for truth and veracity was bad. When Lagier subsequently testified that this was his own belief and that he never heard any discussion among other men as to whether Wilson would tell the truth, Lagier's testimony was stricken by the court and this was held to be a proper ruling on appeal.

In view of the foregoing, we hold that, if Judge Sears said that H—was a perjurer and if similar statements were made by the other two persons concerning L—, this would not be admissible in evidence to establish that H— and L— had reputations as perjurers since there is nothing to indicate that any of the three persons had knowledge of the *reputation* of H— and L— in the neighborhoods where these men lived. Accordingly, we reject this contention of counsel.

Counsel contended that H— was a fantastic witness because, when his testimony was taken *de novo*, he mentioned that "he had conversations with the respondent in which respondent had said he had been a member of the Communist Party," and that H— did not mention this when his testimony was taken originally. Counsel said, "* * * he was asked these questions; his only explanation was that he didn't remember it before." The record shows that there are certain inaccuracies in these assertions of counsel. There was only one conversation concerning the matter; H—had not been previously questioned along this line; he did not specifically say that in this conversation the respondent told him that he (the respondent) had been a member of the Communist Party; and H— did not give as an explanation that he had not previously remembered the conversation.

It may be that H— told the examining officer about his above-mentioned conversation with the respondent at some time prior to the taking of the *de novo* testimony. In any event, during his direct examination on January 13, 1953, the examining officer asked H— the specific question as to whether he had any conversation with the respondent concerning his membership in the Communist Party. H— replied that, during the first week after he commenced his employment at the Western Worker, he had asked the respondent as to what had impelled him to become a member of the Communist Party, and that the respondent said that he was dissatisfied with the treatment of intellectuals generally under the capitalist system and admired the treatment they received in the Soviet Union. Counsel cross-examined H— concerning this conversation at pages 803–805, 808, 889–894. At page 891, H— explained why he had not previously furnished this information. It was not because he had not remembered this conversation but because he had not been asked any question along that line at the original hearing and he had tried to confine himself to answering the questions he was asked. For the reasons indicated, there is no merit in this contention of counsel.

It was stated by counsel: "* * * much of L—'s testimony was objectively untrue because at the time that L— testified about his contacts with the respondent here, he (the respondent) had been in a sanitarium." As we have indicated above, L— testified that he met the respondent in 1933 and that he had seen the respondent at various times during 1934 and 1935. The record indicates that the respondent was admitted to a sanitarium on May 22, 1934, for observation as to whether he had tuberculosis and that he was discharged on August 17, 1934, but he was not restricted to the sanitarium nor to the grounds surrounding the sanitarium and could have been seen by L— even during this period. In any event, this was a period of less than three months and would not contradict L—'s testimony

655

as to his contacts with the respondent during the remainder of 1934 and 1935.

Counsel stated that the special inquiry officer's ruling [allegedly excluding three statements about L— and H—] was directly contrary to *Communist Party of U.S.A.* v. *Subversive Activities Control Board*, 351 U.S. 115 (1956), and *Mesarosh* v. *United States*, 352 U.S. 1 (1956). In the former, while the case was pending before the Court of Appeals for review, the Communist Party filed a motion for leave to adduce additional evidence which became available to the petitioner subsequent to the administrative proceeding, and it was asserted that this evidence would establish that the testimony of three Government witnesses (C—, J—, and M—) was false. The petitioner listed a number of witnesses it proposed to call to substantiate its claim and submitted a detailed affidavit in support of its allegations. The Government did not deny these allegations. The Supreme Court reversed the judgment of the Court of Appeals and remanded the case in order that the Subversive Activities Control Board might pass upon the allegations and reconsider its decision. In the *Mesarosh* case, in which one M— was a Government witness, the Solicitor General informed the Supreme Court that M— had given testimony in certain other cases which the Solicitor General believed to be untrue, and the Supreme Court reversed the judgments of conviction and granted the petitioners a new trial.

In the two cases cited above, the trier of the facts did not have knowledge of the challenge to the credibility of the Government witnesses. In the respondent's case, however, the special inquiry officer has considered the respondent's challenge to the credibility of the Government witnesses and this Board also has authority to decide factual issues. *Matter of B—*, 7—1, 36 (Atty. Gen., 1956). We find that H— and L— were credible witnesses in this proceeding.

During the oral argument, counsel stated that he would again like to submit an argument he had previously made in the G— case to the effect that the *Scales* case further clarified the *Rowoldt* doctrine concerning the test of membership. The G— case is reported as *Matter of G—Q—*, 9—376 (1961), and the other cases, in which counsel failed to furnish citations, are: *Rowoldt* v. *Perfetto*, 355 U.S. 115 (1957), and *Scales* v. *United States*, 367 U.S. 203 (1961). In the latter, Scales had been convicted under the so-called membership clause (18 U.S.C. 2385), and the Supreme Court affirmed the Court of Appeals which had upheld the conviction. In *Matter of G—Q—*, *supra*, we fully discussed and rejected counsel's contention. We said that the *Scales* case "indicates no more than the fact that a person who has been a member [of the Communist Party] is not precluded from explaining that his membership was artificial." For the

656

reasons mentioned in *Matter of G—Q—*, we hold that, in a deportation proceeding, the determination of whether an alien has been a "member" of the Communist Party is to be made in accordance with the judicial definition of "member" as set forth in *Galvan* v. *Press*, 347 U.S. 522 (1954), and *Rowoldt* v. *Perfetto, supra*.

Counsel alleged that witness H— stated that he attended meetings and never engaged in any particular kind of activity; that the respondent's membership was "about like mine, nothing much to it"; and that H— identified himself and the respondent as nominal members. H— did not say that there was "nothing much" to the respondent's membership nor that the respondent was merely a nominal member. It is true that H— himself apparently devoted almost no time to Communist Party activities other than his attendance at meetings. When asked to state his own knowledge of whether or not the respondent devoted any more time to Communist Party affairs then he, H— answered, "No, I didn't know specifically that he did." He also said that the respondent was not an officer and that he was not in authority. H— stated that he was puzzled as to why the respondent was in his group, composed of writers, since he did not know of anything that the respondent had written. He was then asked, "* * * aside from the fact that you wondered why he was there and that he showed knowledge of the theory of dialectical materialism you had no reason to believe that he was any different, for instance, than were you?" and he answered, "No reason at all."

Apparently it was upon the question and answer last quoted that counsel predicated his statement that H— said that the respondent's membership was "about like mine, nothing much to it." When considered in context, however, we do not believe that meaning can be attributed to it and we consider the question and answer as being somewhat ambiguous. Actually, the question seems to relate to a personal comparison of the respondent and H— and not a comparison concerning the nature of their memberships in the Party. We observe that H— stated on October 30, 1952 (Exh. 23, p. 6), that the Communist Party had taken some disciplinary action against the respondent but "he was very active in these meetings, had a good deal to say, was the chief guide on policy and attitude but held no office that I recall," and that the respondent "was the one that had the most to say and apparently he had most authority." Counsel has not claimed that there is a contradiction between this testimony of H— on October 30, 1952, and his testimony at pages 1444 and 1453, and he was not questioned at the reopened hearing concerning the statement we have quoted from Exhibit 23. He seems to have known nothing about the respondent other than his contacts with him at the Communist Party meetings of the group of which both were members.

H— had appeared as a Government witness on January 16, 1953, which was prior to the decisions in *Galvan* v. *Press* and *Rowoldt* v. *Perfetto*, *supra*, and his testimony was offered for the purpose of establishing that the respondent was a member of the Communist Party but not the nature of the membership. While the testimony of H— establishes that the respondent was a member of the Communist Party during 1946 and 1947, we do not hold that his testimony alone would establish that the respondent's membership was within the judicial definition stated in the *Galvan* and *Rowoldt* cases. On the other hand, the testimony of H— does not establish that the respondent's membership in the Communist Party was so nominal as to be excluded from the judicial definition. The respondent has not attempted to deny that he was a member of the Communist Party, nor has he attempted to claim that his membership was other than voluntary and meaningful.

Counsel also contended that he should have been furnished with the statement made by witness B— to an officer of the Service as was done with respect to a statement made by witness H—. However, counsel had specifically requested the production of the statement made by H— during his cross-examination on January 16, 1953, and the special inquiry officer had denied the request. On the other hand, B— testified on January 14, 1953, that he had executed a signed statement concerning the respondent before an officer of the Service but there was no request for the production of the statement until the last day of the hearing on August 24, 1961. The reopened hearing commenced on October 18, 1960, and six adjournments were granted at the request of counsel. It would seem that the request for B—'s statement should have been made earlier in the proceeding. In any event, we hold that, inasmuch as there was no demand for B—'s statement during his cross-examination in 1953, counsel is not now entitled to the production of the statement nor to a further cross-examination of B—. *United States* v. *Farley*, 292 F.2d 789, 792 (C.A. 2, 1961).

We have examined the remaining contentions of counsel but these are without merit and do not require specific discussion. It is possible that the respondent might be statutorily eligible for suspension of deportation under 8 U.S.C. 1254(a)(5). However, the special inquiry officer asked whether any application for discretionary relief would be made on behalf of the respondent and, after some consideration, counsel stated that no such application would be made.

During the 1951 hearing, the respondent was called as a Government witness but refused to be sworn on advice of counsel although he made no claim that his testimony might incriminate him. He was, nevertheless, asked a number of questions at that time, including whether he was then or had ever been a member of the Communist

658

Party, but he made no answer to any of the questions. At the 1953 hearings, the respondent again refused to be sworn and refused to answer certain questions of the special inquiry officer and the examining officer. At the hearing on March 10, 1961, the respondent again refused to be sworn and declined to answer most of the questions propounded by the examining officer, including whether he was then or had ever been a member of the Communist Party. We stated above that we found H— and L— to be credible and we also find that B— and H— were credible witnesses in this proceeding. It is our considered opinion that it has been established by reasonable, substantial and probative evidence, that the respondent was, after entry, a member of the Communist Party of the United States as the word "member" was judicially defined in *Galvan* v. *Press* and *Rowoldt* v. *Perfetto, supra,* and that he is deportable on the charge stated in the warrant of arrest. In view of the foregoing, the appeal will be dismissed.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.