Victor
**GAMEROS–HERNANDEZ, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 88–7045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 17, 1989.

Decided Aug. 31, 1989.

Roxana C. Bacon, Bryan, Cave, McPheeters & McRoberts, Phoenix, Ariz., for petitioner.

John R. Bolton, Asst. Atty. Gen., David J. Kline, Asst. Director, Carl H. McIntyre, Linda S. Wendtland, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Before HUG, HALL and O'SCANNLAIN, Circuit Judges.

HUG, Circuit Judge:

Victor Gameros–Hernandez petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ's") decision finding him deportable for entering the United States without inspection in violation of 8 U.S.C. § 1251(a)(2) (1982). We conclude that the evidence was insufficient to support a finding of illegal entry and therefore reverse.

## I.

Gameros–Hernandez is a 40–year–old native and citizen of Mexico who was admitted to the United States as a lawful permanent resident on March 11, 1975. His wife, Ester, has been a lawful permanent resident since 1969. The couple has four children, three of whom are United States citizens. Since 1979, Gameros–Hernandez has been employed as a machinist for Walbar, Inc., a manufacturer of aircraft parts located in Tempe, Arizona.

The government's claim that Gameros–Hernandez entered the United States unlawfully is based upon an incident that occurred on January 1, 1984. In the early morning on that date, a sensor located on the United States–Mexico border was activated, indicating that an illegal entry had possibly taken place approximately one-quarter mile east of the port of entry at Douglas, Arizona. After being apprised of this sensor activity, a border patrol agent stationed in Douglas climbed an observation tower from which he sighted Gameros–Hernandez and a woman, later identified as Aracelya Ochoa–Salas, an undocumented alien. The two were in a ditch on the United States side of the border near a hole in the international boundary fence.

Gameros–Hernandez was stopped a few moments later by another border patrol agent. When asked by this agent to explain his presence near the border, Gameros–Hernandez produced his alien registration ("green") card and, pointing toward Mexico, stated that he had just come from visiting friends. Both Gameros–Hernandez and Ochoa–Salas were briefly detained at the border patrol station in Douglas.

Thereafter, Gameros–Hernandez was released, and Ochoa–Salas was allowed voluntarily to return to Mexico.

Four months later, in April 1984, the Immigration and Naturalization Service ("INS") reversed its initial decision to decline prosecution of Gameros–Hernandez and issued an order to show cause why he should not be deported for entering the United States without inspection. Apparently, the INS had concluded that Gameros–Hernandez unlawfully entered the United States with Ochoa–Salas through the hole in the boundary fence. At his subsequent deportation hearing, however, Gameros–Hernandez offered an explanation of the events of January 1 that conflicted with the government's theory. According to Gameros–Hernandez, he and his family were returning from a visit with relatives in Mexico on that date. After driving all night, they stopped in Agua Prieta, a Mexican border town, to purchase gasoline. While waiting for a gas station to open, Gameros–Hernandez walked over to a restaurant to buy a cup of coffee. Outside of the restaurant, he was approached by Ochoa–Salas, a young Mexican woman who appeared to Gameros–Hernandez to be very poor. Ochoa–Salas asked Gameros–Hernandez if he would help her enter the United States. Out of compassion, Gameros–Hernandez agreed to meet the young woman in the United States after she crossed through a well-known hole in the international boundary fence.

Gameros–Hernandez claims that he and his family were then inspected and lawfully admitted to the United States through the port of entry at Douglas, Arizona. After leaving his family at a store in Douglas, Gameros–Hernandez walked to the hole in the boundary fence where he had agreed to meet Ochoa–Salas. Five yards from this hole, running parallel to the fence on the United States side of the border, is a deep ditch. Because Ochoa–Salas indicated that she could not traverse this ditch alone, Gameros–Hernandez climbed down into the ditch and up the other side in order to help her. Although he came as close as two meters to the boundary fence, Gameros–

Hernandez insists that he never crossed the border into Mexico. With Gameros–Hernandez' assistance, Ochoa–Salas then crossed the ditch, but the two were stopped by the border patrol shortly thereafter.

Mrs. Gameros–Hernandez also testified at the deportation proceedings. She indicated that she was completely unaware of her husband's actions with regard to Ochoa–Salas and confirmed that he had entered the United States lawfully at Douglas. The IJ concluded, however, that both Gameros–Hernandez and his wife were not credible witnesses. He therefore adopted the government's theory, that Gameros–Hernandez unlawfully entered the United States through the hole in the boundary fence, and found Gameros–Hernandez deportable. The BIA affirmed this finding over the dissent of two members who argued that the evidence of entry without inspection was insufficient.

## II.

The Supreme Court has held that "no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." *Woodby v. INS*, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). We, on review, must determine whether there is reasonable, substantial, and probative evidence in the record as a whole to support the IJ's conclusion that the INS has successfully carried this heavy burden. *See Paointhara v. INS*, 708 F.2d 472, 474 (9th Cir.), *modified on other grounds*, 721 F.2d 651 (1983).

As the INS points out, the subject of deportation proceedings must, as an initial matter, make some showing that he or she has entered the United States legally. *See* 8 U.S.C. § 1361 (1982).[1] In the present case, Gameros–Hernandez established by uncontroverted evidence that he is a lawful permanent resident in possession of a valid green card. In doing so, he satisfied this initial burden. *See Trias–Hernandez v. INS*, 528 F.2d 366, 368 (9th Cir.1975) (production of visa and green card sufficient to shift burden to INS to prove subsequent illegal entry). It then became the task of the INS to prove by clear, unequivocal and convincing evidence that Gameros–Hernandez' entry into the United States after his visit to Mexico was without inspection. Our review of the record convinces us that the INS failed to carry this burden.

Even if Gameros–Hernandez' story is not specifically credited, the record contains scant evidence that he crossed the border in an unlawful manner. No eyewitnesses exist to substantiate this alleged illegal crossing. Further, Gameros–Hernandez' statement to the border patrol agent that he had just come from visiting friends in Mexico, far from being an admission of unlawful entry, is entirely consistent with his claim that he was properly inspected and admitted to the United States through the port of entry at Douglas. Finally, the testimony in this case regarding the activation of the sensor was ambiguous at best. Indeed, the border patrol agent who testified at the deportation hearing admitted that Gameros–Hernandez could have activated the sensor without leaving the United States.

Gameros–Hernandez is a long-term resident of the United States with strong ties to the community in which he lives. As the Supreme Court noted in *Woodby*, such ties should not lightly be severed:

> This Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification. In words apposite

---

**1.** Section 1361 provides in relevant part:

In any deportation proceeding ... against any person, the burden of proof shall be upon such person to show the time, place, and manner of his entry into the United States, but in presenting such proof he shall be entitled to the production of his visa or other entry document, if any, and of any other documents and records, not considered by the Attorney General to be confidential, pertaining to such entry in the custody of the Service. If such burden of proof is not sustained, such person shall be presumed to be in the United States in violation of law.

**842**

to the question before us, we have spoken of "the solidity of proof that is required for a judgment entailing the consequences of deportation."

*Woodby*, 385 U.S. at 285, 87 S.Ct. at 487 (quoting *Rowoldi v. Perfetto*, 355 U.S. 115, 120, 78 S.Ct. 180, 183, 2 L.Ed.2d 140 (1957)). The circumstantial case presented by the INS at Gameros–Hernandez' deportation hearing lacks this requisite solidity of proof. We are therefore simply unable to conclude that the INS has produced "reasonable, substantial, and probative evidence" sufficient to meet the burden of clear, unequivocal, and convincing proof that Gameros–Hernandez entered the United States without inspection on January 1, 1984. The decision of the BIA is reversed.

REVERSED.