Laszlo **BERDO**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

No. 18898.

United States Court of Appeals,
Sixth Circuit.

June 5, 1970.

G. Vernon Leopold, Detroit, Mich., on brief for petitioner.

George W. Masterton, Jr., Dept. of Justice, Washington, D. C., for respondent; Robert M. Draper, U. S. Atty., Southern District of Ohio, Cincinnati, Ohio, Thomas R. Smith, Asst. U. S. Atty.,

on the brief; Paul C. Summit, Atty., Dept. of Justice, Washington, D. C., of counsel.

Before McCREE and COMBS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This case arises out of the Hungarian Uprising against the Russian Military Occupation Forces in 1956.

Laszlo Berdo, petitioner herein, was twenty years old at the time. He joined thousands of other students and citizens as a street fighter against the Russian troops and tanks, in Budapest; and he now seeks asylum in the United States as a defector from the Hungarian Communist government.

Berdo's petition, more specifically described hereafter, can be designated as one for asylum and is opposed by the Immigration and Naturalization Service on the ground that Berdo is a former member of the Communist Party of Hungary, inadmissible to the United States and is, therefore, ineligible to adjust his status from a non-immigrant visitor to that of a permanent resident; that he has not sustained the burden of proving his claim that he would be subject to persecution on account of his political opinions if deported to Hungary, and that the order of the Board of Immigration Appeals in arriving at that conclusion is not arbitrary, capricious, or an abuse of discretion.

In his petition for review of the order of deportation and denial of adjustment of status, petitioner Berdo contends that the Board of Immigration Appeals erred in affirming a determination by the Service that his affiliation with the Hungarian Communist Party prior to his entry into the United States amounted to membership within the meaning of the pertinent statute, since such affiliation was not meaningful, and was devoid of political implication; and that the Board erred in holding that his deportation and prosecution and punishment in Hungary would not constitute persecu-

tion by reason of political opinion within the meaning of the Immigration and Nationality Act.

The background, the facts of the case, and the legal proceedings involved may be stated in more detail as follows:

Petitioner Berdo was born March 21, 1936, in Budapest, the son of Peter and Anna Berdo. He attended the public school in Budapest, completing the eighth grade in 1951, shortly after he was fifteen years old. After leaving school, he acquired a mechanic's rating through participation in an on-the-job training course. In 1954, he was employed by the Duclos Mine Machinery Works, a state-owned enterprise with headquarters in Budapest. The Duclos company assigned him from time to time to work in field installations in various localities in Hungary assisting in site assembly and in the construction of mine shafts.

During October 1956, he was shifted back to his employer's Budapest plant in order to await his then imminent induction into the Hungarian military service. Before he was drafted, however, the Hungarian Uprising of 1956 intervened. In the latter part of October of that year, he witnessed a blood bath inflicted by a Soviet tank which fired point blank into a crowd of Hungarian citizens in Budapest. On the same day, he and a number of his co-workers, after arming themselves with rifles and pistols taken from the Hungarian Army's Rifle Patrol Post in Budapest, gathered on the roof of the Budapest Railroad Station and fired upon Soviet tanks and military personnel. Toward the end of the day he returned to his parents' apartment and told his sister, Klara, about his activities. He then returned to a rendezvous with his resistant-group companions and during the day which followed continued to take part in the street fighting in Budapest.

The Uprising failed because of subsequent overwhelming armed intervention of the Soviet army; and the details of this action and its results, which are pertinent and of importance in the determination of this case, will hereafter be described. However, here, we note that sometime after the Hungarian revolt had been crushed by the Russian military forces, means of exit from Hungary were closed and sealed.

During the fighting, approximately 30,000 Hungarians were killed, while 200,000 others escaped over the border to Austria, among whom were Berdo's sister, Klara, and her family—while Berdo was battling with the Russians. Klara Berdo thereafter emigrated to the United States, married Tibor Absalon, and has since been naturalized as an American citizen.

Petitioner Berdo was still in the country. Nevertheless, he escaped detection as one of the Street Fighters by leaving Budapest. He persuaded the Duclos company, for which he had been working as above stated, to assign him to a field project in Tatabanya, approximately forty-two miles from Budapest. When he finally received his notice of induction into the Hungarian Army on April 18, 1957, he returned to Budapest and reported for military service. After induction he was stationed at the same post in Budapest where, during the Uprising, he had participated in removing arms for street fighting, and he remained fearful of recognition by members of the post. During the course of his training, the political commissar of his unit called him in for interviews at different hours of the day and evening and persisted in urging him to join the Communist Party, emphasizing that Berdo's father had been a member of the Party. Although Berdo procrastinated with various excuses and evasions, the Colonel-Commissar continued his recruitment efforts, and kept badgering him to join the Party. Berdo, however, avoided joining during his military training, and after completion of his service in January 1959, returned to his employment with Duclos. Shortly thereafter the Party Commissar at the Duclos Works received a recommendation from the Political Commissariat of Berdo's

former military unit to the effect that prior efforts to recruit him for Communist Party membership should be continued and, subsequently, Berdo was subjected to the same persuasion to join the Party. He thereupon exercised his privilege as an ex-serviceman to change jobs and, in June 1959, entered the employ of the Gorgyiu-Dej Shipbuilding Works in Budapest. However, the Communist Party's dossier followed him and, within a few weeks, he again became subjected to Party recruitment. When he further delayed, he was suddenly demoted in February 1960, reduced in pay and assigned to perform menial tasks inconsistent with his skill as a mechanic.

Berdo protested his new job assignment and instituted a complaint before a Work Grievance Committee. This Committee conducted extensive hearings over a period of two and a half months and subsequently granted him a release from employment at Gorgyiu-Dej. He had not been informed that his demotion and reduction in pay had a disciplinary purpose for failure to join the Communist Party, but he claims that the connection between the two events was conveyed to him in many subtle ways, such as sanctimonious persuasion and offers of incentives and opportunities for improvement. In February 1960, Berdo obtained employment as a mechanic with Tungsram Electric Works in Budapest and was assigned to perform work in a vacuum tube research laboratory. During his new job with Tungsram, he was again called into the Party Commissar's office; extensive discussions and repeated reviews of his past employment career by Party officials followed, and it was pointed out to him that Party membership would furnish him with an endorsement enabling him to gain admission to a four-year night highschool-level training course, which would qualify him for a job as an electronic technician. He was informed that after completion of such highschool education, he would become eligible to participate in a four-year course with the university which would qualify him as an electronic engi-

neer capable of assuming charge of an electronic laboratory; and he was told that Party membership would prove most helpful to him in the future in obtaining good housing.

At this time, Berdo's needs for economic betterment and adequate housing had become crucial. In June 1959, he married and after the wedding he and his wife had moved into the one-room, one-kitchen apartment of his parents in Budapest, already occupied by Berdo's mother, his brother and sister-in-law and son, Istan. After three months of overcrowding, it was necessary for him and his wife to move to some other place but, as a childless couple, they had no priority toward obtaining an apartment. They finally obtained quarters in a 6 x 12 stable. They had no cooking or heating facilities, but ate in the factory cafeteria. During the winter, they moved in with the parents of Berdo's wife. Because of these desperate conditions, Berdo finally agreed to become a member of the Communist Party; he enrolled in the night high school, and continued his schooling there until 1964.

We now come to the legal proceedings giving rise to the controversy before us.

In the Fall of 1964, petitioner Berdo made application to the Legation of the United States in Budapest for issuance of a non-immigrant visa for himself, his wife, and their daughter, who was born in 1963. His sister Klara had invited them to spend the year-end holidays with her and her family in Grand Rapids, Michigan. In his application for a visa to the United States, Berdo, among other matters, fully disclosed his Party membership. A security check initiated by the Legation of the United States in Budapest disclosed: "No additional derogatory information" and on recommendation of the responsible Consular officer at the Legation, the Service granted him a waiver of his inadmissibility under Section 212(a) (28) (C) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a) (28) (C), to enter the United States. He was then granted temporary admission to this country as

a visitor, for pleasure, for a period of thirty days, "for the compassionate reason of permitting him to visit his relatives and also to cause him to be exposed to the American way of life."

In due course, Berdo, his wife and child, entered the United States at New York City on December 11, 1964, for a 30-day period. Upon his arrival in the United States he decided to seek political asylum here and, on January 5, 1965, he, together with his wife, child, sister and brother-in-law, drove from Grand Rapids to Detroit and, ineptly, requested asylum from one of the receptionists in the employ of the Immigration Service. However, later, the Service dispatched an inspector to call upon Berdo and to take his statement.

Thereafter, on March 3, 1965, the Immigration Service instituted deportation proceedings against him under Section 241(a) (2) of the Immigration and Nationality Act, 8 U.S.C.A. Sec. 1251(a) (2), and directed him to show cause why he should not be deported after admission as a non-immigrant under Sec. 101(a) (15), of the Act, 8 U.S.C.A. § 1101(a) (15), for having stayed in this country for a longer time than permitted.

After a deportation hearing, the Special Inquiry Officer of the Immigration Service in Detroit found Berdo deportable as charged, but permitted him, under Sec. 243(h) of the Act, 8 U.S.C. § 1253(h) to file an application for relief from deportation by reason of anticipated physical persecution. Later the Special Inquiry Officer entered a decision and deportation order granting Berdo, by way of an alternative to deportation, the privilege of voluntary departure and, as part of the order, denied his claim for relief from deportation on the grounds that he had failed to sustain the burden of proof that, if deported to Hungary, he would suffer physical persecution. This order was affirmed by the Board of Immigration Appeals on August 31, 1965. However, in view of the then impending Congressional passage of P.L. 89–236, 79 Stat. 911, the Service did not

thereafter require Berdo and his family to depart. This Act, which became effective on December 1, 1966, provides brothers and sisters of American citizens with fifth preference quota status. Also, on December 1, 1965, an amendment to Sec. 243(h) of the Act took effect, pursuant to which the Attorney General could now withhold Berdo's deportation upon a showing of anticipated economic or similar persecution on account of race, religion, or political opinion as compared to the former criterion of *physical* persecution. Act of October 3, 1965, 79 Stat. 918.

On June 4, 1966, the Immigration Service approved the petition of Berdo's sister, an American citizen, to consider Berdo's eligibility for adjustment of status under Sec. 245 of the Act (fifth preference quota status). After a further hearing, the Special Inquiry Officer of the Service denied Berdo's application for adjustment of status, again found Berdo deportable but, in lieu of deportation, granted him the privilege of voluntary departure; and, in the event of his failure to depart voluntarily, ordered him deported to Hungary. He further denied Berdo's application for relief from deportation by reason of anticipated persecution under Section 243(h) of the Act as amended, and, on appeal, the Board of Immigration Appeals sustained the Special Inquiry Officer's determination, findings, and orders.

Afterward, the Special Inquiry Officer, on motion filed by counsel for Berdo for reconsideration, and to open the proceedings to submit additional evidence, denied reconsideration, but directed reopening of the proceedings in order to present additional evidence—both in connection with his application for adjustment of status and stay of deportation—and, after the reopened hearing, again found Berdo ineligible for adjustment of status under Section 245 of the Act; granted him voluntary departure in lieu of deportation; directed his deportation to West Germany, if that country would accept him; and in the event that West Germany would not ac-

cept him, he was ordered deported to the People's Republic of Hungary. He further denied Berdo's request for withholding of deportation under Section 243(h) of the Act, as amended; and certified his decision and order to the Board of Immigration Appeals, which, by order dated July 29, 1968, sustained the decisions and orders of the Special Inquiry Officer. Berdo then filed a petition in this court for review of the decision of the Board of Immigration Appeals.

Since Berdo has been in this country with his wife and daughter, a second child, Laszlo Berdo, Jr., was born on September 1, 1967, and, under the law and statutes, he is a native-born citizen of the United States, now two and a half years old.

We first discuss the claim of respondent government that the "remote possibility that [petitioner] Berdo may face from two to five years in prison for failing to return to Hungary immediately after the termination of his visit in this country would still fall far short of persecution even under the broader meaning which may be attributed to that term under the 1965 amendment to the statute, which also restricted the persecution to be on account of race, religion or political opinion." In this regard, it is not to be overlooked that petitioner Berdo was a man who took part in the armed street fighting in Budapest, and has publicly admitted, since his departure from Hungary, that he killed a Russian soldier in the fighting.

Moreover, the government, in distinguishing the case of petitioner Berdo from a case involving a citizen of Czechoslovakia, in which the Board of Immigration Appeals reached a conclusion, opposite to that in Berdo, contends that there has been a gradual relaxation of restrictions and harsh measures imposed by the Communist government in Hungary, compared to the restrictions and harsh measures adopted in Czechoslovakia.

In considering these arguments, we turn to a discussion of the conduct of the Russian and Stalinist Hungarian government in Hungary as a result of the revolution in Hungary, since, in our view, the events that took place during and after that Uprising have a direct relevance to the issues presented by this case.

The Hungarian Uprising of 1956 is already a major event of world history. The background of the case, including the action of the Hungarian citizens and their leaders prior to, during, and after the Uprising, as well as the conduct of the Hungarian Communist Party, and the Russian Government and armed forces, are matters of common historical knowledge, which were reported, in many cases, from day to day, by the newspapers of New York, Chicago, London, Manchester, Moscow, and other centers.[1] During the course of this opinion, such matters are referred to, not as facts or factors decisive in our determination—but only explanatory of the events that happened and as circumstances leading to the Special Message to Congress of President Eisenhower on January 31, 1957; the Joint Resolution of Congress of August 6, 1957, declaring that the crushing of the Hungarian Revolution was "catastrophic in nature, and subsequent events shocked the conscience of the free peoples of the world"; and the Joint Resolution of Congress of June 24, 1958, entitled "United States Expression of Sympathy for Hungarians,"—all of which are set forth in detail in the subsequent pages of this opinion.

In addition, the actual facts surrounding the Hungarian Uprising were ascertained by the Special Committee on the Problem of Hungary, of the United Nations, composed of representatives of Australia, Ceylon, Denmark, Tunisia and Uruguay, created by the General Assem-

[1]. The essential portions of such newspaper reports are set forth and quoted in "The Hungarian Revolution," published by Frederick A. Praeger, New York, 1957.

bly of the United Nations under its resolution 1132 (XI) adopted at its plenary meeting on January 10, 1957. United Nations General Assembly, Official Records, Eleventh Session, Supplement No. 17 (A/3572), pp. 64, 65. See also United Nations Year Book, 1957, p. 60 et seq. and Documents on American Foreign Relations, 1957, p. 182 et seq., published for the Council on Foreign Relations, Harper and Brothers, New York, 1958. This Report of the United Nations Special Committee on the Problem of Hungary was released to the public, June 20, 1957. United Nations General Assembly, Official Records, Eleventh Session, Supplement No. 18 (A/3592) pp. 137–139; and the Report was adopted by General Assembly Resolution 1133 (XI) on September 14, 1957. United Nations General Assembly, Official Records, Eleventh Session, Supplement 17 A (A/3572/ Add. 1) p. 1. The adoption of the Report of the Special Committee on the Problem of Hungary had been strongly urged on the General Assembly of the United Nations by Joint Congressional Resolution of August 6, 1957, setting forth that "it is the sense of the Congress that the President, through the United States representatives to the United Nations at the forthcoming reconvening of the General Assembly of the United Nations, should take every appropriate action toward the immediate consideration and adoption of the Report of the United Nations Special Committee on the Problem of Hungary, and toward the immediate consideration of other available information on the brutal action of the Soviet Union in Hungary," all of which appears in the Joint Resolution of Congress hereinafter set forth. See also the Report of the United Nations General Assembly's Special Representative on the Hungarian Problem, H.R.H. Prince Wan Waithayakon, President of the Eleventh Session of the General Assembly, filed December 5, 1957, in which he recounted his futile appeals to the Foreign Minister of the Soviet Union, and the Foreign Minister of Hungary for humanitarian treatment of the deportees to Russia, and persons detained in concentration camps, as well as those awaiting trial, and his plea for due judicial process in the trials, concluding with the statement that, although he had failed in his mission in finding any chance of negotiation, "I cannot believe that the Hungarian and Soviet Governments will remain insensible to the voice of world opinion and the conscience of mankind which continue to make an insistent and righteous appeal for the freedom of the Hungarian people." United Nations Document A/3774, dated December 9, 1957. See United Nations Year Book 1957, p. 65, and also, Documents on American Foreign Relations, 1957, p. 191, published for the Council on Foreign Relations, Harper and Brothers, New York, 1958.

As to the number of Hungarian citizens leaving their country as refugees from the Russion armed forces, the facts appear in the United Nations Year Book, 1957 (supra) p. 232 et seq. See also United States Senate Report No. 1817, to accompany H.R. 11033, on Hungarian Refugees. U.S.Code Congressional and Administrative News, 85th Congress, Second Session, 1958, Vol. 2, p. 3147 et seq.

From the foregoing, it generally appears that the Uprising commenced on October 21, 1956, with massive demonstrations of students in three Hungarian universities demanding a better life for themselves, complete freedom of the press and all other kinds of liberty, and, the next day, a further demand that Soviet troops be withdrawn from Hungary. On the following day, October 22, 1956, great crowds in Budapest assailed the existing Communist regime in Hungary and demanded that Imre Nagy, a former Prime Minister, be called again to the office of Prime Minister. On October 23, 1956, the streets and the square at the Parliament Building were packed with 250,000 people shouting and demonstrating in favor of Imre Nagy, who was, on that evening, named Prime Minister by the Communist Party Secretary. The Secretary, at the same time, issued

a call to the Russian troops stationed in Hungary to come to Budapest.

Two members of the Soviet Presidium flew to Budapest from Moscow, angered over the action of the Communist Party Secretary in calling in the Soviet troops, since Moscow had just adjusted a similar situation with Poland without the use of armed force. However, when the new Prime Minister, Nagy, spoke for the first time to the people on radio, the representatives from Moscow refused to allow him to say that he had not called the Russian troops to Budapest. They then flew back to Moscow expecting the Russian troops to restore order. However, when the Russian troops came to Budapest, they came in tanks bearing Hungarian flags. They had been quartered for a long time in Hungary, and a number of the Russian tanks joined the demonstrators and allowed them to ride about the square on the tanks. About fifty other Russian tanks with open turrets were in the square, and their crews were talking and joking with the people. Suddenly, armed men on the roofs of the buildings adjoining the Parliament Building started firing into the square with machine guns. These machine-gunners were the Hungarian secret police, hated by the people. The Soviet troops in the tanks, thinking they were being attacked by counter-revolutionists, fired at the roof tops and quickly silenced the secret police, but several hundred people lay dead on the square as a result of the machine-gunning from the roofs. Resentment flared through Budapest. Confusion erupted as to who was firing on whom. Hungarian soldiers began to fight the Soviet troops and the workmen and students secured small arms and fired upon the Russian soldiers as well as destroying many tanks by hurling bottles of gasoline against them.[2]

Nagy appealed and threatened, by turn, for cessation of this fighting. Finally, on October 29, it was announced that the Soviet troops would withdraw from Budapest; and the Soviet Union announced it was willing to reconsider its position on troops in the satellites. Nagy then announced that free elections would be held, and abolished the one-party system. These announcements were contrary to the entire Russian policy with the satellite countries. Following these announcements, the Russians, who seemed to have been acting seriously in stating they would reconsider their position on troops in the satellite countries, sent more troops into Hungary, as the old troops withdrew from Budapest.

Nagy then informed the Soviet Ambassador that the new entries of Soviet troops violated the Warsaw Treaty, and that it would be denounced unless the troops were withdrawn. As additional Soviet troops poured in, Nagy denounced the Treaty, and promulgated a declaration of neutrality. On November 4, Russian artillery opened fire on Budapest, and Soviet tanks again entered the city. Nagy and fifteen of his associates with their wives and children were accorded refuge in the Yugoslav Embassy, just three days after Nagy had denounced the Warsaw Treaty.

The revolution was crushed. The new Prime Minister, installed under the direction of the Soviet government, was Janos Kadar. He entered into a written agreement with the Yugoslavs to the effect that Nagy and his friends, who were still in the Yugoslav Embassy, would be free to return to their homes, and there would be no reprisals. Nagy and his friends left the Yugoslav Embassy and entered the bus provided by the Hungarian Minister of Armed Forces. Two Yugoslav diplomats were in the bus when, suddenly, a Soviet officer managed to get in after them. This action was protested by the Yugoslav officials. A car with Soviet security agents in it stopped in front of the bus and another behind it. The Yugoslav officials again protested against the ac-

2. John MacCormac, the veteran Central European correspondent of The New York Times, reported on October 27, 1956.

tion of the Soviet officials, whereupon the Yugoslav officials were simply thrown out into the street.

Nagy and his companions were carried off by the Russians to Romania. There, Nagy and several of his associates, after a Soviet trial, were hanged.

However, the freedom fighters had been able for some months to take over control of the western part of Hungary. More than 100,000 Hungarians had escaped to Austria by November 20, 1956.

President Eisenhower, under his emergency powers, permitted the immediate immigration to the United States of 15,000 of these refugees. Vice-President Nixon was on the Hungarian frontier in December, and on January 1, 1957, he submitted his report to the President, stating that the United States and other free nations must take substantially more refugees than they had agreed to take up to that time. On December 31, 1956, already 19,663 Hungarian refugees had come to the United States. On January 19, 1957, 24,000 refugees had been admitted, or cleared for admission, to the United States. In April, the quota of 30,000 refugees for the United States had been filled and there were assurances from Washington that further immigration would be facilitated. By the end of 1956, as heretofore mentioned, more than 200,000 Hungarians had escaped from their native country and had left it forever. During this great emigration, the Budapest government had enacted emergency decrees defining such expatriation as a crime, with penalties from six months to five years in prison.

It is plain, especially from the circumstances of this case, that "deviations" from Soviet ideology and political practice meet with death or savage retribution in Hungary from Russians and Hungarian communist leaders allied with the Soviet. Laszlo Rajk, Foreign Minister of Hungary, was executed by the Hungarian Communist functionaries in 1949, for having confessed under torture that he was a "Titoist." On February 2, 1957, two people, one a girl of twenty, were hanged in Budapest for organizing and leading armed bands during the riots in December. By the end of March, more than 200 persons had been executed in Budapest for activities during the riots.

Reduced to its elements, this case represents two principal issues: (1) Was petitioner inadmissible as a former member of the Communist Party, and thus ineligible to adjust his status to that of a permanent resident and, therefore, deportable as a result of his affiliation with the Hungarian Communist Party? (2) As a defector, would petitioner, with reasonable certainty, under the evidence in this case, suffer persecutory action, if he were deported to Hungary?

██ It is petitioner's contention that his membership in the Communist Party in Hungary was politically inconsequential and meaningless. An examination of the record convinces us of the truth of his contention, not only because he was a street fighter against the Hungarian Communist police, but also against the Russian military forces. He was practically, after numerous procrastinating delays on his part, forced to accept membership in the Communist Party thereafter in order to avoid the grossest deprivation and to secure some economic benefit to make endurable the hardships in the living conditions of his wife, his child, and himself, which he had no way of alleviating, except through affiliation with the Communist Party. His membership after he had fought against the Communists in the streets of Budapest and had thereafter escaped detection when the revolution was crushed, plainly proves that such membership was devoid of political implications; and a charge of deportability based on the charge of such membership cannot be sustained.

Dr. William Solyom-Fekete was a witness for Mr. Berdo before the Special Inquiry Officer. Dr. Fekete, as he is called throughout the record, is employed as a legal specialist in the European Law

Division of the Library of Congress, and has been employed there since 1957. He is a native of Hungary who, after attending the Royal Hungarian Pazmany University Law School, obtained his degree of Doctor of General Law in 1941. Thereafter, he practiced law in Budapest. In 1945, he joined the Hungarian Independent Small Holders Party, which was opposed to the Communist and Social Democratic Parties. In 1947, the Small Holders Party was subjected to heavy pressure by the Communists and the Soviet occupation forces. Dr. Fekete then left the Small Holders Party to join a new group, the Hungarian Independence Party. Immediately after the elections held in 1947, Dr. Fekete was arrested by the Secret Police, but was fortunately released because of the absence of evidence of his commission of any illegal acts against the regime. In October 1956 at the time of the Hungarian revolution against the Soviet government and the Soviet armed forces, Dr. Fekete participated in political matters, advising the revolutionists as to the formation of workers' councils in the factories.

After the crushing of the revolution by the Russian armed forces, and after the execution of Prime Minister Nagy, Dr. Fekete escaped from Hungary on November 19, 1956. On the petitioner's hearing before the Special Inquiry Officer, Dr. Fekete testified as to the kinds of pressure exerted by the Hungarian Communist Party to recruit members after the revolution in which, as an instance, the officials placed before a worker an application blank for admission to the Party, and a notice of dismissal from his employment, forcing the worker to choose whether to become a Party member or be dismissed from employment.

Dr. Fekete further testified as an expert on Hungarian criminal law and stated that all offenses against public order are punishable by the criminal law of Hungary; that the meaning of "public order" is determined by Communist ideology, in line with the overall objective of the Communist Party to achieve control over every facet of the life of Hungarian citizens; that the provisions of the law prevent the Hungarian people from extricating themselves from Communist control, by defecting abroad; that petitioner's wife had also rendered herself subject to trial and punishment for the offense of failure to return to Hungary after coming to the United States; that petitioner would probably be punished for his participation in the 1956 Revolution and, more specifically, he would, in all probability, in view of his killing of a Russian soldier, be tried for murder, conspiracy against the government, counter-revolutionary activities, and offenses against public security. There is no need to review Dr. Fekete's testimony as to the additional mistreatment that petitioner would suffer, before his trial, such as solitary confinement and extreme police brutality, if he were deported.

Dr. Fekete, as stated, was an acknowledged expert witness on Hungarian criminal law. Not only that, but he had made a study for the Judiciary Committee of the United States Senate on relations of Church and State in Hungary, and policies of the government and the Communist Party, which was published as Document No. 38–8240, 89th Congress, First Session. The Board of Immigration Appeals, itself, had also referred, in one of its decisions, to a report made by Dr. Fekete as an authority followed in its decision.

Another report, made by Dr. Fekete, was entitled: "Refusal to Return to Hungary," which dealt with the Hungarian Criminal Code of 1961. Dr. Fekete testified also that an amnesty law promulgated March 1963 would not prevent Berdo from being prosecuted for crimes committed during the Hungarian Uprising of 1956, since he would be entitled to amnesty only if he had not committed a crime against the state within three years of the promulgation of amnesty— that is, before March 1966. But his failure to return to Hungary before March 1966 would be a crime against

the state and he could now be prosecuted for his participation as a Freedom Fighter, and could be tried and convicted of killing a Russian soldier in 1956; and, because he had killed a Russian soldier, the imposition of capital punishment would be the probable penalty.

In addition to his qualifications as an expert witness and his own work for our government in preparing studies for Congress, it is also remarkable that Dr. Fekete had personal knowledge of the stables in part of which petitioner, his wife, and his child, were lodged before he became affiliated with the Communist Party in Hungary. Dr. Fekete testified that he knew the very stables in question, and that they were "completely unfit for human habitation." It was not until petitioner became affiliated with the Communist Party that he could move from the stables and secure slightly more livable quarters.

The Special Inquiry Officer, in the hearing, expressly accepted Dr. Fekete as an expert witness on the subject of petitioner's being imprisoned, if he were returned to Hungary, in these words:

"The Special Inquiry Officer: I do believe that, as an expert witness, he is qualified to express an opinion on that. I will let him answer the question."

Dr. Fekete answered that, in such a case, the probabilities were very high that petitioner would receive the maximum term of five years in prison, or close to five years, merely for going abroad and failing to return.

Dr. Fekete was, apparently, the best witness that could be secured in this country on the question of Hungarian political parties, Communism in Hungary, the Hungarian criminal law, and its application to Hungarians who left Hungary to go to another country and refused to return, as did petitioner.

However, in the Decision of the Special Inquiry Officer, in referring to Dr. Fekete's testimony as to the Hungarian criminal law and his conclusions as to what would happen to petitioner if he should be deported to Hungary, the Officer tendered the following gratuitous statement:

"While I have no basis or desire to discredit Dr. Fekete or any factual testimony given by him, it is obvious, during the three-day hearing given respondent, at which Dr. Fekete was, at all times, present, that he felt a strong allegiance to respondent and counsel."

This is only one person's superficial view of the matter—an observation made by the Special Inquiry Officer, completely unsubstantiated by evidence or cross-examination of Dr. Fekete. The statement above referred to was made after the Special Inquiry Officer had stated, with regard to Dr. Fekete's testimony as to Hungarian criminal law and what would happen to petitioner if he should be deported, that he believed Dr. Fekete was an expert witness and was qualified to testify on that subject. There is no evidence apparent from the record, or from any questions asked Dr. Fekete, that "he felt a strong allegiance to respondent and counsel." This statement had the result of undermining Dr. Fekete's credibility and his expert testimony; and we cannot, under the evidence and the circumstances of this case, accept any such statement that Dr. Fekete's testimony was colored by any "allegiance" to Berdo and his counsel.

The statement of the Special Inquiry Officer that "it was obvious during the three-day hearing given respondent, at which Dr. Fekete was, at all times present," etc., appears as a contrived suggestion to show that Dr. Fekete was so assiduous in helping petitioner that he made it his business to be present at all times during the hearing. This was not at all the case. The fact was that the Trial Attorney for the Immigration Service took pains to point out, in a special statement, that the witness, Dr. Fekete, an American citizen and a United States Government employee, had been granted permission by the Attorney General of the United States to testify in this matter as an expert witness, for

the convenience of the government and in the interest that justice be done. Dr. Fekete, as an employee of the government, could not have testified except with the consent of the Attorney General.

■ Is it conceivable that a man who had escaped from Hungary because of his political beliefs; who was anti-Communist; who thereafter became a citizen of the United States; who was made Legal Specialist in the Foreign Language Division of the Law Library of the Department of Congress; whose duty it was to prepare reports for Congress on matters affecting the Communist government of Hungary; who testified only by permission of the Attorney General of the United States in the interest of justice, would color his testimony because of a strong allegiance to a Communist whom he had never seen before? The idea is incredible and the statement of the Special Inquiry Officer is without any evidence to sustain or justify it.

It is further argued in the brief of the Board of Immigration Appeals that, since the Hungarian Revolution, there has been a relaxation of restrictions and harsh measures imposed on Hungarians by the Communists, as compared with Czechoslovakia. It is further stated in the brief that "the Czech proponents of a harsh party line, supported by the Kremlin, have been more vigilant than in some other Communist countries" in-

cluding, as is obviously implied, Hungary. There is no evidence whatever that this is the case.

Hungary has proved, in recent years, to be a country more dangerous to the lives and liberties of Hungarians, than Czechoslovakia or any other iron-curtain countries, to their citizens. There have been no iron-curtain countries, in which 30,000 citizens have been slain in the streets by the Russian armed forces; or continued executions of political leaders; or any exodus of 200,000 of its citizens, never to return. The Hungarian Communist government executed its Foreign Minister for "Titoism." The Soviet army, after supporting Imre Nagy as Prime Minister of Hungary, becoming disappointed with his official acts, kidnapped him from Budapest and took him to Romania, where it executed him. Hungary is dangerous for the man who tries to leave, and more dangerous for the one who is forced to return—if we are to judge by the occurrences in October, November, and December of 1956, and by the efforts of all free nations to help the fleeing Hungarians, including the unprecedented action of the United States in admitting to our country approximately 35,000 such immigrants.

Hungary has been referred to as a special case, with regard to immigration. On January 31, 1957, President Eisenhower submitted to Congress a special message,[3] directed to the immigration of Hungarians, which is here pertinent.

---

3. "To the Congress of the United States:

"The eyes of the free world have been fixed on Hungary over the past 2½ months. Thousands of men, women, and children have fled their homes to escape Communist oppression. They seek asylum in countries that are free. Their opposition to Communist tyranny is evidence of a growing resistance throughout the world. Our position of world leadership demands that, in partnership with the other nations of the free world, we be in a position to grant that asylum.

"Moreover, in the 4½ years that have elapsed since the enactment of the Immigration and Nationality Act, the practical application of that law has demonstrated certain provisions which operate inequitably and others which are outmoded in the world of today.

"Prompt action by the Congress is needed looking toward the revision and improvement of that law.

EMERGENCY LEGISLATION

"Last October the people of Hungary, spontaneously and against tremendous odds, rose in revolt against Communist domination. When it became apparent that they would be faced with ruthless deportation or extinction, a mass exodus into Austria began. Fleeing for their lives, tens of thousands crossed the border into Austria seeking asylum. Austria, despite its own substantial economic problems, unselfishly and without hesitation received these destitute refugees. More

On June 24, 1958, Congress passed a joint resolution entitled "United States Expression of Sympathy for Hungarians," [4] which here directly bears upon certain of the issues in this case.

ingness to accept large numbers of them.

"On November 8, I directed that extraordinary measures be taken to expedite the processing of 5,000 Hungarian visa applications under the provisions of the Refugee Relief Act. On November 19, the first of this group departed from Vienna for the United States. By November 29, it had become clear that the flight of Hungarian men, women, and children to gain freedom was assuming major proportions.

"On December 1, I directed that above and beyond the available visas under the Refugee Relief Act—approximately 6,500 in all—emergency admission should be granted to 15,000 additional Hungarians through the exercise by the Attorney General of his discretionary authority under section 212(d) (5) of the Immigration and Nationality Act; and that, when these numbers had been exhausted, the situation be reexamined.

"On December 12, I requested the Vice President to go to Austria so that he might inspect, firsthand, the tragic situation which faced the refugees. I also appointed a President's Committee for Hungarian Refugees Relief to assure full coordination of the work of the voluntary agencies with each other and with the various Government agencies involved."

4. "Whereas the revolt of the Hungarian people in 1956 against Soviet control was acclaimed by freedom loving people throughout the world; and

"Whereas the suppression of the Hungarian revolt of 1956 by the armed forces of the Soviet Union was condemned by the General Assembly of the United Nations; and

"Whereas the leader of the Hungarian Government and people in the unsuccessful revolt against Soviet oppression was induced to leave the sanctuary of the Yugoslavian Embassy in Budapest on promises of safe conduct and fair treatment on the part of the Hungarian Communist regime which was not in a position to take such action without the approval of the Soviet Union; and

"Whereas these promises were treacherously ignored by Soviet forces and Imre Nagy was seized and held incommunicado; and

"Whereas the Soviet imposed Communist regime of Hungary has now announced that Imre Nagy, together with his colleagues Miklos Gimes, Pat Maleter, and Jozsef Szilagyi have been tried and executed in secret; and

"Whereas this brutal political reprisal shocks the conscience of decent mankind: Now, therefore, be it

"Resolved by the House of Representatives (the Senate concurring), That it is the sense of the Congress of the United States that the President of the United States express through the organs of the United Nations and through all other appropriate channels, the deep sense of indignation of the United States at this act of barbarism and perfidy of the Government of the Soviet Union and its instrument for the suppression of the independence of Hungary, the Hungarian Communist regime; and be it further

"Resolved, That it is the sense of the Congress of the United States that the President of the United States express through all appropriate channels the sympathy of the people of the United States for the people of Hungary on the occasion of this new expression of their ordeal of political oppression and terror." 72 Stat. B10.

On August 6, 1957, Congress passed a joint resolution [5] declaring that the crushing of the Hungarian Revolution was catastrophic in its effects on Hungarian citizens.

## HUNGARY

5. "Whereas the Hungarian freedom revolution which broke out October 23, 1956, was catastrophic in nature, and subsequent events shocked the conscience of the free peoples of the world; and

"Whereas the barbaric action of the Soviet Union in Hungary demonstrates that the Soviet Union is determined to go to any and all lengths to maintain its empire of enslaved peoples by the most brutal forms of armed subjugation and repression; and

"Whereas the Special Committee on the Problem of Hungary, created by the General Assembly of the United Nations under its resolution 1132 (XI) adopted at its six hundred and thirty-sixth plenary meeting on January 10, 1957, has established that what took place in Hungary in the latter part of 1956 was a spontaneous national uprising caused by long-standing grievances engendered by the oppressive way of life under Communist rule and by the state of captivity of Hungary under control of the Union of Soviet Socialist Republics; and

"Whereas the crisis and foment created by developments in the satellite nations re-

All of the foregoing demonstrates the special consideration which the President and Congress had for those suffering from the Hungarian Communists and Soviet armed forces during the Revolution of 1956. President Eisenhower was specifically referring, in his Message to Congress, to men, like petitioner, who "spontaneously and against tremendous odds, rose in revolt against Communist domination."

As to the law here applicable, it appears that subsequent decisions of the Board of Immigration Appeals do not support its holding in this case and, in fact, are contrary to such holding.

In the Matter of Janus and Janek, A–14813095–6, and A–14805412, decided by the Board on July 25, 1968, the Board held:

"(1) In the exercise of discretion, adjustment of status under section 245, Immigration and Nationality Act, as amended, is granted an alien whose non-immigrant entry was not intended to bypass the normal visa-issuing process; who has close family here; who is eligible for visa issuance and who is unwilling to return to his native Czechoslovakia where he has been convicted, in absentia, of defection from the republic, sentenced to imprisonment, and his property confiscated.

"(2) Applications for withholding of deportation under section 243(h) of the Act alleging fear of persecution for political opinion are granted two natives and citizens of Czechoslovakia who, although members of the Communist Party at time of their nonimmigrant entry, by their uncontradicted testimony express their long-standing opposition to the political regime in Czechoslovakia; who defected at the first opportunity, one repudiating his entrusted mission of propagandizing for the Communist government in this country, and other overtly making his criticism of conditions in Czechoslovakia to agencies which could disseminate it widely and effectively; and who have both been convicted, in absentia, of defection from the republic and sentenced to imprisonment.

"(3) The legal posture of an applicant for conditional entry under section 203(a) (7) is not that of an applicant for withholding of deportation under section 243(h) of the Act and specific standards of conduct cannot be set which will guarantee, without more, inclusion in or exclusion from eligibility for either benefit sought. An application under either section 203(a) (7) or 243(h) *must be decided indi-*

quire a continued reevaluation by the United States and the United Nations of strategic policy to meet changing conditions: Now, therefore, be it,

"*Resolved by the House of Representatives (the Senate concurring)*, That it is the sense of the Congress that the President, through the United States representatives to the United Nations at the forthcoming special reconvening of the General Assembly of the United Nations, should take every appropriate action toward the immediate consideration and adoption of the report of the United Nations Special Committee on the Problem of Hungary and toward the immediate consideration of other available information on the brutal action of the Soviet Union in Hungary. It is further the sense of the Congress that the President, through such United States representatives, should at such reconvened session join actively in seeking the most effective way of dealing with the report of the United Nations Special Committee in order to advance the objectives of the United Nations regarding the situation in Hungary, to prevent further repressive action by the Soviet Union, and to seek all practical redress of the wrong which has been committed in violation of the principles of the United Nations and the elemental requirements of humanity.

"Sec. 2. It is the sense of the Congress that the United States should implement policies, through the United Nations or in cooperation with the peoples of the free world, that will work toward the freedom and independence of the captive nations, and will effectively utilize the position of the United States through all proper means, to the end that the Hungarian tragedy shall not be repeated anywhere." 71 Stat. B38.

*vidually, on all its facts."* (Emphasis supplied.)

The foregoing case involved three respondents, Frantisek Janus, his brother, Jaroslav Janus, and Vladimir Janek. As disclosed in the decision of the Board, the case of Frantisek Janus differed from that of the other two respondents. Frantisek was 42 years old, married, a native and citizen of Czechoslovakia, whose only entry to the United States was on July 7, 1966, as a non-immigrant for pleasure. His authorized stay expired on August 31, 1966, and he remained beyond that date without authorization. He conceded he was deportable as charged. At the deportation hearing, held on October 26, 1966, he learned that it was possible to apply for adjustment to permanent-resident status in the United States; and the hearing was adjourned to enable him and his brother to prepare and present such applications, based on petitions for fifth-preference quota status, to be filed by one of their two American-citizen brothers. The petitions were filed and were approved in January 1967; then and now there was immediate quota availability based on the priority date created by the filing of the petitions.

In ruling upon the case, the Board said:

"The special inquiry officer, stating that Frantisek's application for adjustment had not been completely processed because of the decision the special inquiry officer had decided to make, assumed Frantisek to be statutorily eligible. The application and the record do not disclose any basis of ineligibility. The special inquiry officer, in considering the discretionary factor, referred to testimony by this respondent that when he applied for his visa he was seriously considering remaining here permanently, a fact which he did not tell the Consul for fear that he would not be able to come to the United States. It was respondent's further testimony that although he then wished to stay here permanently, he did not make the final decision to do so until after his arrival in the United States. On this basis, the special inquiry officer decided that respondent was not a bona fide nonimmigrant at the time of entry, and, citing Matter of Ortiz-Prieto, 11 I & N Dec. 317, stated that there were no equities in the case which indicated that the results of the application should be other than adverse, as in the cited case.'"

"We do not believe that a denial of adjustment is warranted. Here, as in *Ortiz-Prieto*, a favorable factor is that respondent's entry on a nonimmigrant visa was not made to bypass the normal visa issuing processes. In this case, however, it was the special inquiry officer himself, three and a half months after their entry, who first made the Janus brothers aware that it was possible to apply for adjustment, and that their citizen brothers could file petitions to secure quota preferences for them. Neither this respondent nor his brother began to work in this country until after the deportation proceedings were instituted. Respondent has close family here (his two citizen brothers); his wife, who remained in Czechoslovakia, has not made any objection to the application for adjustment. Respondent, who is clearly eligible for visa issuance and has the requisite quota availability, cannot take advantage of these factors anywhere but in the United States. He has no foreign country to which he can go to apply for a visa; he is understandably unwilling to return to Czechoslovakia, where he has been convicted in absentia, of 'Defection from the Republic', sentenced to a year's imprisonment, and has already had all of his property confiscated. Respondent has been working steadily since he took his first job in the United States and has been sending money to Czechoslovakia for the support of his wife and children; he has no criminal record other than the above mentioned conviction.

"The total picture justifies a favorable exercise of discretion on Frantisek Janus' behalf, and we will provide for a grant to him of adjustment to permanent resident status, under Section 245, in our order at the conclusion of this decision."

As to the cases of the two other respondents, the Board stated the facts and its conclusions as follows:

"Vladimir Janek, who has no family here, and no quota availability, made no application for adjustment. He was a voluntary member of the Communist Party who started doubting its goals in 1957, after the Hungarian Revolution, and who, by 1963, considered himself its enemy and had started thinking about ways to escape from Communist Czechoslovakia. He has asked for political asylum here as a defector.

"Jaroslav Janus made application under Section 245, on the basis of his brother's petition for fifth preference quota status. On the Form I–485, he showed that he had been a member of the Communist Party in Czechoslovakia from the summer of 1956 to the time of his departure in July, 1966. He stated that when he applied for a visitor's visa in Prague, he was specifically asked by the American Consular Officer whether he had ever been a member of the Communist Party, and he denied it because he was afraid that, if he told the truth, he would not have been given a visa and would not have been able to come to the United States. The special inquiry officer, after considering respondent's claim that his Party membership was involuntary found that it had not been sustained, and that respondent was precluded from establishing eligibility under Section 212(a) (28); he also found, using the standards of Matter of S- and B-C-, 9 I&N Dec. 436, that respondent had made a material misrepresentation in denying membership, and was thus precluded from establishing adjustment eligibility under Section 212(a) (19). We accept the special inquiry officer's holding that this respondent is statutorily ineligible for adjustment of status under Section 245.

"Both of these respondents have applied for withholding of deportation to Czechoslovakia under Section 243(h), claiming they would be persecuted for political reasons if they were to return. Each already has awaiting him a prison sentence on a conviction entered against him in absentia under Article 109 of the Criminal Law of Czechoslovakia. Article 109 is entitled: 'Defection from the Republic'. It covers (1) a person who leaves Czechoslovakia without permission, (2) a Czechoslovak citizen who remains in a foreign county without permission, and (3) one who organizes either of those acts or leads a group or groups of people across the border, they being without permits to leave the country. Each respondent has been found a Defector from the Republic under the second category.

"In Jaroslav Janus' case, the court sentenced him to a year's imprisonment and ordered all of his property confiscated. His uncontradicted testimony is that not only were all of his personal effects taken, along with the automobile given jointly to him and his brother Frantisek by their two United States citizen brothers, but half of the property he owned in common with his wife as well. He and she, among other things, owned a 50% interest in their family home; the government did not sell or confiscate the home; but instead made his wife pay 15,000 crowns for respondent's share. (The special inquiry officer stated, at page 17, of the Janek record, that as of November 1, 1965, the exchange rate for the Czechoslovak crown was $.14 US. Thus, as part of the confiscation Jaroslav's wife paid $2,100 to the Czech Government.) Frantisek Janus was also sentenced to a year's imprisonment and to confiscation of his property. The record of his conviction characterized his crime as harmful to society because, among other things, he had denigrated the good name of the Czechoslovak Republic. It may be assumed that the

same characterization was made of Jaroslav Janus' acts.

"Vladimir Janek was sentenced to eight months' imprisonment, with no confiscation of property. The record of conviction shows that Janek's wife testified that after he had advised her by letter that he intended to remain in the United States, he began to write letters in which he expressed homesickness, from which she assumed that he would undoubtedly wish to return to Czechoslovakia. (Janek testified that this was a fabrication on his wife's part.) From this, and after a review of his background, the Court believed 'that the defendant committed a criminal act obviously at the instigation of some other persons and without a thorough deliberation of his action.' The Court then specifically stated that it had set the sentence at the lowest level of the legal schedule so that it would offer the defendant an opportunity to return to Czechoslovakia. Janek and his witnesses all believed that this attempt to get him back was to counteract the harmful effect of his, and other people's defections, but that once he was back he would be subject to considerably harsher treatment.

"Both Janek and Jaroslav Janus believe that if they were to return, more would await them than the sentences now in effect. Each was a member of the Communist Party and testified that this fact alone would make the crimes more serious in the eyes of the government (both witnesses who testified in Janek's case agreed with this view). Once they were actually in the custody of the Czech authorities, there was no telling for how long they would be imprisoned. They claimed, too, that punishment and ostracism would continue even after release from prison, that they would thereafter be relegated to hard labor, perhaps in the mines, and would never again be able to get jobs above the menial level.

"Respondent Janek cited additional reason for fearing dire consequences. Shortly after his arrival here, he gave a four-hour interview to the Federal Bureau of Investigation, in which he discussed conditions in Communist Czechoslovakia as they actually were. He was also interviewed on the same subject for Radio Free Europe, and later by the Czech language press in the United States. Exhibit 10K is the front page of one such newspaper, containing the story of his departure and conviction, and setting forth prominently the fact that immediately upon his leaving the Czech tourist group with which he came here, he contacted the newspaper and gave it information about the actual state of affairs in Czechoslovakia. We have little doubt that at least some, if not all, of these facts are known to the Czech Government.

"Janek testified that he vocally differed with and criticized communist policy for at least ten years. His first disenchantment was about the Hungarian Revolution. He was then at officers' school, scheduled to become an officer in the army. He stated that he spoke out critically about those events and was dismissed from the school, two or three months before the completion of his course. He stated that when he first joined the Party, he had believed that it really was working for the good of all, but:

" '* * * gradually I came to the conclusion that everything the party stands for is illogical and unacceptable for me. Gradually I saw for myself that the words, that the leaders of the Communist State used, when they stated that they were working for the benefit of the people and for the country, were not based on any truth— that they were all lies—and that those leaders were committing crimes against the nation. When I found this out I spoke against it at the meetings of the Party and of the Labor Union about those facts. However, I found out that any position which I took against these facts were completely in vain and to no avail. Moreover, I have been attacked on several occasions and that I was a re-

actionary and that I was speaking in the spirit of the western ideology. Later I became discriminated against in my work and people who once used to be my friends began to ostracize me. I became so disgusted that from 1963 I refused to take any part in any activity in public.'

In a sworn statement made to a Service investigator, Janek named at least five offices he had held in communist organizations before his cessation of activity in 1963. He also said he had been told that he had been denounced by the State Security in the summer of 1964 because he had stated publicly, at a meeting of the employees of the plant where he worked, that the methods by which Khruschev had been deposed were intolerable.

"Testifying further about his reasons for becoming anti-Communist, he said it became obvious to him that many crimes had been committed for which the perpetrators had never been brought to justice—many, many people executed and afterwards 'rehabilitated', but that nothing had been done about those executions, it was just 'as if somebody had shot a rabbit.' Since he was in a lower echelon of the Party, he could stand up and speak out against these things, but his criticism was in vain. As he put it: 'It was just like throwing peas on the wall, they bounced back and nothing happened.'

"He decided in 1963 that he would have to leave Czechoslovakia. He twice tried to get permission to leave, once to West Germany, and once to Austria, but was refused each time. It was then that he decided to give up his skilled and well-paying job as a chemical worker (he testified that he had earned 2,800 to 3,000 crowns a month—$392 to $420—a very high income by Czech standards) and to go to work as a miner.

" 'I went there—also the work is extremely difficult and most of the workers there are sent for punishment —I just wanted to disappear from their eyes, meaning the Party. I wanted to disappear from the eyes of the people who knew what my convictions were because at that time I planned already for a year that I would take a trip abroad to the west. Because all travel abroad has to be approved by the communist party and by the worker's committee I would never stand a chance that I could get such approval to travel west. At my new place of work I received approval where they did not know me.' "

The Board commented on the foregoing by stating that the Special Inquiry Officer, in deciding the case against him, has disregarded or glossed over much of the material mentioned by the Board, with the statement that Janek was not subjected to persecution while in Czechoslovakia and that, generally speaking, overt acts in the United States manifesting opposition to the country of possible deportation do not support an application under Section 243(h); and that it was the Officer's further holding that there had been no showing that the conviction in absentia was politically motivated. "We feel," however, said the Board, "that these criteria have been taken and used out of context." The Board went on:

"While it is true that we have not regarded with favor an applicant whose first indication of opposition to the political regime of the country he left is made after arrival in the United States, that is not what confronts us here. Janek's uncontroverted testimony is that he started expressing opposition in 1957 in Czechoslovakia and was dismissed from the officers' school for it; that he continued to express his dissenting views, although his criticism had no effect except to injure him. The sincerity and strength of his opposition is shown by the fact that his criticism here was not made in private to friends and acquaintances but to agencies which could best put it to use and could disseminate it most widely and effectively. We do not doubt that if he were to return to Czechoslovakia, he would

be punished for these acts under Articles 102 (Defamation of the Republic, etc.), 103 (Defamation of the President or other public representative, etc.), 104 (Defamation of a state belonging to the world Socialist system), 106 (exposure of State secrets—this respondent worked in uranium processing plants and offered to share his knowledge with the United States Government), and 112 (violation of the interests of the Republic abroad) of the Criminal Law, and we believe that under these circumstances such prosecution would in effect be persecution for political opposition. This is a factor to be reckoned with, especially when the acts committed in the United States are not the beginning but the continuation of a year's long course of expression of opposition to the Communist Czech regime.

"It cannot be said, across the board, that every statute imposing criminal sanctions for unauthorized travel outside of a particular country must be devoid of political implications. That will depend upon the provisions of the particular statute and the manner in which it is administered. The one under which respondent was convicted is, by its own denomination, aimed at 'Defection from the Republic.' The act of defection normally has political, rather than criminal, connotations. Also a conviction that concerns itself with the fact that the defendant comes from a worker's family, that by his failure to return he took advantage of the confidence shown in him, and that he did not act as a good citizen when at the first available opportunity he defected from his native country and remained abroad, does not, it appears to us, have travel control as its prime concern.

"On evaluation of all the material and testimony presented by Janek and on his behalf, we conclude that he has so strongly shown the likelihood of persecution for his opposition to the political system in Czechoslovakia that it cannot be disregarded. We are mindful, too, of the letter in Janek's file from the State Department to the District Director at New York, received by him on September 12, 1967, in which it is stated:

"'On the basis of the information contained in Mr. Janek's file, the Department does not favor his deportation to Czechoslovakia * *.' We shall grant to Janek the requested withholding of deportation under Section 243(h)."

With regard to the case of respondent Jaroslav Janus, the Board said:

"[H]e testified that he had never believed in the tenets of communism and was opposed to the regime from the time of its accession to power in 1948; he was the only member of his family to join the Communist Party. His brother Frantisek was approached but refused to join; his brother Jaromir was so opposed to the regime that he tried to escape from Czechoslovakia illegally in 1955, was arrested and imprisoned for 4–5 months (his wife obtained his release from jail by a petition to the President), and since that time has been unable to get a job as anything but a delivery man in a factory, despite the fact that he has been trained in certain skills. Jaroslav testified that none of his four children is a member of the Party: 'I brought them up in a way to be opposed to the Communist Party'. His own membership in the Party was passive; he held no office and did not always attend the monthly meetings. He testified that he joined the Party because he felt it was necessary to protect his family's financial security. He had broken his wrist in about 1955 and the bone took more than a year to heal; even at the end of that time, the wrist was inflexible so that he could not work, as he had before, on the assembly line. Although the union provided for a disabled worker to the extent of establishing that he was entitled to 80% of his base salary during illness or injury for a period

of up to one year, the worker was nevertheless in financial straits because his salary was normally augmented by overtime pay, and 80% of the base salary was not sufficient compensation. Also, although the union offered some job protection in that the worker after recovery was entitled to get a job in the same plant it did not have to be on the same level as the prior job. It was in this situation, after a considerable period of injury and materially lowered income and enough residual disability so that he could not return to any manually skilled job, that Jaroslav Janus was approached by the Party with the promise that if he joined he would get a foreman's job, but that if he did not, he would get a lesser job than he originally had (he believed this might have been on the level of a cleaning man or delivery man) and he decided to join the Party. He makes no claim that he ever publicly denounced the Party or its goals, although he was always opposed to communism, he apparently lived with his membership as a necessary evil, doing no more than he had to to maintain that membership. He testified that he had no difficulty in obtaining his passport to come to the United States because his brothers had visited Czechoslovakia a short while before, and he was requesting the passport to visit them in the United States. He also stated that before he left, he was visited by a representative of the Secret Police who told him that if he should meet people in the United States, especially immigrants from Czechoslovakia, who criticized the Czechoslovak regime, he (Janus) should explain that the situation had improved very much and should try to change the person's anti-Communist views.

"Jaroslav Janus left Czechoslovakia because of his disagreement with the Communist system; he left with the intention of never returning. Nothing in the files indicates anything other than this political motivation for his renunciation of the country where he was born and lived for 47 years. He is genuinely afraid of reprisals by the Czech Government if he should be forced to return, not simply because he has remained away longer than authorized, but because he, a member of the Communist Party in good standing, entrusted with the mission of propagandizing for the Communist government in the United States, showed his true political sentiments by defecting. The punishment imposed upon him by the Czech court under Article 109/2, including not only the sentence to imprisonment but, on his very first offense of any kind, the confiscation of all of his property; the severity with which that confiscation was carried out, including the enforced contribution by his wife of $2,100 to cover the value of his interest in their home; the concern, in the record of his brother's conviction, with the defection from the Republic and with the denigration of the good name of Czechoslovak Republic; all of these factors persuade us that what would await Jaroslav Janek upon his return to Czechoslovakia would not be punishment for violation of an ordinary criminal statute (the prosecution has already taken place), but persecution for the political offense he has committed against the State. We hold that respondent has satisfied the requirements of Section 243(h), as amended by the Act of October 3, 1965, and will grant to him also a withholding of deportation." [6]

6. It is worthy of note that the Board in the case of the three respondents saw fit to consider and discuss some of the objections that voluntary agencies, interested in immigration cases, had made of the too stringent standards adopted by the Board in these cases, and the charge

that it had imposed a far too heavy burden on the alien, in these words:

"Counsel and the voluntary agencies that have interested themselves in these cases contend that the special inquiry officers and the Board continue to apply a far too stringent standard and

All of the essential grounds upon which the Board relied in the instant case to sustain the order of deportation, were grounds which were disclaimed by the Board as a basis for the deportation of one or another of the above-mentioned respondents in the Janus and Janek case.

In the Board's brief in the instant case, it is observed that in Janus and Janek, "the fact that it was a test case, extensively briefed and argued by experts on conditions in Czechoslovakia who were cognizant of the immediate conditions there, may also have had a bearing on the case's outcome." There is nothing in the Board's opinion indicating what experts "extensively briefed and argued" that case. In any event, any weight that would be given to such briefing and arguing "by experts" would be entirely discounted when compared to the undisputed evidence of such outstanding an expert as Dr. Fekete, on the

impose a far too heavy burden on the alien in these cases, ignoring the change made in the law by the 1965 amendment, and ignoring, too, the equating by that act of the standard necessary for a Section 243(h) withholding with the standard for establishing eligibility as a conditional entrant under Section 203 (a) (7). They contend that the special inquiry officers and the Board do not recognize certain truths; i. e., that a man may be fleeing from a country even though he does not cross its borders clandestinely but exits with proper documentation; that statutes restricting all travel outside of a country and punishing violations with imprisonment or, other criminal sanctions, are inherently political in character and not analogous to provisions such as Section 215, Immigration and Nationality Act; that any person, therefore, who leaves an Iron Curtain country and stays out of it longer than authorized, faces political persecution on his return, and should not be deported back behind the Iron Curtain, etc.

"The Board has recognized the changes made in Section 243(h) by the 1965 amendment and has not only shaped its own decisions to accord to the changed standards but has often granted reopening and remanded cases so that an application for a stay heard under the older and more stringent standards can be considered under the new. Special inquiry officers have themselves reopened proceedings for the same purpose. The Board recognizes, too, that flight may be made with legal documentation, and has not restricted its rulings on 243(h) eligibility to persons who climbed under fences or swam rivers at night. We are not persuaded, however, that an applicant for conditional entry under Section 203(a) (7) is in the same legal posture as an applicant for a withholding of deportation under Section 243(h). Nor do we believe that specific standards of conduct can be set which will guarantee, without more, inclusion in or exclusion from eligibility for the benefit being sought. Both under der Section 203(a) (7) and Section 243 (h) cases must be decided *individually, on all of their facts; the performance of a particular act or the following of a specified course of conduct are no more than guidelines for arriving at a result on the basis of an entire record.* We are not convinced that every travel restriction imposed by an Iron Curtain country and punished, in the breach, by imprisonment, is political persecution; or that every person who leaves such a country and subjects himself to the penalties provided under those laws by remaining outside of his country for longer than permitted is a bona fide refugee, or a person who will be subject to persecution on his return because of his political opinion. A person whose departure from an Iron Curtain country is devoid of political motivation, or whose decision not to return is unrelated to the politics of that country (e. g., the person who finds better economic opportunity here, or enters into a marital relationship with a resident alien or United States citizen) is not entitled to a Section 243(h) stay solely on the basis that he may face criminal prosecution for overstay. Nor is a person who has not expresesd opposition to the political regime before departure automatically excluded from relief, if he can show that his departure was politically motivated and that any consequences he faces on return are political in nature. *Each case, as we have said before, must be considered on all of its facts, each factor given its proper weight. We are aware of the inherent nature and intended function of the 243(h) stay provisions, and have shaped our decisions accordingly.*" (Emphasis supplied.)

subject of Hungarian political and cultural conditions and the criminal law of Hungary and its application to and effect upon a defector like Berdo.

█ In the foregoing cases, the Board stresses the fact that Janek's testimony is *uncontroverted* that he started expressing opposition to the Communist regime in 1957. However, in the instant case, there was the uncontroverted evidence of petitioner Berdo's testimony of his action as a street fighter in Budapest against the Hungarian Communist government and the Soviet armed forces; his continuing refusal to affiliate with the Communist Party until it was necessary to do so to avoid impossible harsh living conditions for his wife, his child, and himself, and to secure living quarters in place of the stable, which, according to the uncontroverted testimony of Dr. Fekete, were "completely unfit for human habitation."

It is submitted in the brief of the Board in the instant case that it is not at all certain that petitioner would be tried and convicted, if deported to Hungary, and that: "The testimony of Dr. Fekete, Berdo's expert witness, attempts to prove too much in this respect. His predictions of the certain arrest and conviction awaiting Berdo under the Hungarian law of return, with a resulting prolonged prison term, if not death, apparently did not persuade the Board." That is evident. But while the discretion of the courts should not be substituted for the discretion to be exercised by the Attorney General, as provided by law, nevertheless, "We do say that there must be a hearing which will give assurance that the discretion of the Attorney General shall be exercised against a background of facts fairly contested in the open." United States ex rel. Paktorovics v. Murff, 260 F.2d 610, 615 (C.A. 2).

In Kovac v. Immigration and Naturalization Service, 407 F.2d 102 (C.A. 9), the court set aside an order of deportation on the ground that if an alien might be subjected to punishment on return to his country for having deserted his ship, he might be entitled to a temporary stay of deportation if the punishment was a result of his having sought political asylum in the United States, and his punishment on his return was political in nature. While the issues there presented were not the issues in the instant case, much that Judge Browning said, in speaking for the court, is here pertinent.

"Congress did not intend to make the United States a refuge for common criminals, but it did intend to grant asylum to those who would, if returned, be punished criminally for violating a politically motivated prohibition against defection from a police state. The Board itself has recently recognized that relief may be afforded under section 243(h) if an alien can show 'that his departure was politically motivated and that any consequences he faces on return are political in nature,' even though they take the form of criminal penalties for flight. Matter of Janus and Janek, Int. Dec. No. 1900, decided July 25, 1968."

With regard to the foregoing, it is to be observed that Frantisek Janus, one of the respondents in the above-mentioned case, was not, as to his departure from Czechoslovakia, politically motivated, but came to the United States as a nonimmigrant visitor for pleasure; and he was unwilling to return to Czechoslovakia because he had been convicted, in absentia, of "Defection from the Republic," sentenced to a year's imprisonment, and had all his goods confiscated.

In Kovac v. Immigration and Naturalization Service, *supra*, Judge Browning discussed the change made by Congress in Section 243(h) of the 1965 amendment, in which the language, "physical persecution" was changed to "persecution on account of race, religion, or political opinion"; and in the course of the court's opinion stated:

"This amendment followed repeated criticism of the narrowness of the restriction to 'physical' persecution, including a specific reference to rulings

that 'reducing a workman to the lowest stage of ability to work, and thereby depriving him of opportunity of providing for himself and his family, [is] not "physical." ' Congressman Feighan, Chairman of the House Committee which later proposed the amendment, and floor manager of the bill, expressed approval of the latter criticism.

"On another occasion, Congressman Feighan said of the 'physical persecution' requirement that '[w]e should * * * remove from the law this outmoded concept.' In offering the language which was eventually adopted, Congressman Poff stated: 'The clause "physical persecution" is entirely too narrow. It is almost impossible for the alien under an order of deportation to assemble the quantum of evidence necessary to discharge his burden of proof.' 111 Cong.Rec. pt. 16 at 21804 (August 25, 1965).

"From these and other statements in the legislative history of the amendment, it seems beyond argument that by deleting the word 'physical,' Congress intended to effect a significant, broadening change in section 243(h) which would lighten the burden imposed on applicants for asylum by removing the requirement that they show threatened bodily harm. This intent seems especially relevant in cases of alleged economic persecution. The burden of showing a probable denial of *all* means of earning a livelihood arose from the necessity of showing bodily harm. It was a particularly difficult burden for an alien to discharge, and resulted in the denial of relief in cases of economic persecution though the harassment was substantial.

"The amendment thus eliminated the premise upon which courts construing the old statute—and the Board in this case—based the rule that, to come within the reach of section 243(h), a denial of employment opportunities must extend to all means of gaining a livelihood. The amended

statute shifts the emphasis from the consequences of the oppressive conduct to the motivation behind it. An alien is now eligible for the humanitarian relief provided by the statute if he can show that, if deported, he would probably suffer persecution because of race, religion, or political opinion.

"No doubt 'persecution' is too strong a word to be satisfied by proof of the likelihood of minor disadvantage or trivial inconvenience. But there is nothing to indicate that Congress intended section 243(h) to encompass any less than the word 'persecution' ordinarily conveys—the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive. *See* Webster's Third New International Dictionary 1685 (1965).

"Under the amended statute, therefore, a probability of deliberate imposition of substantial economic disadvantage upon an alien for reasons of race, religion, or political opinion is sufficient to confer upon the Attorney General the discretion to withhold deportation."

In the footnotes to the foregoing quotations from the opinion in *Kovac*, it is stated:

"The House Report stated, '[t]echniques of persecution are not limited to bodily violence alone.' Congressman Feighan said on the House floor, '[t]yranny over the mind and spirit of a person has been demonstrated as more fearsome than the ancient methods of torture which characterized the Communist takeover of many countries of Central and East Europe.'

"The techniques Congress seems to have in mind are illustrated in a recent press report, reading in part, 'The Soviet Union is in the throes of a kind of purge. For the past few months citizens who have expressed dissent from Kremlin actions or policies have been losing their jobs and

have been forbidden to live in major cities.' The author describes this use of economic sanctions as 'a muted purge in neo-Stalinist style,' and comments that although '[o]n the surface the forms of socialist legality are respected * * * the intimidating effect remains.' See Wohl, 'Soviet Dissenters Hit by "Purge,"' Christian Science Monitor, Jan. 20, 1969, at 1."

■ The great weight of the evidence shows that petitioner Berdo was subjected to a deliberate imposition of substantial economic disadvantage to bring about his affiliation with the Communist Party in Hungary; that he would be subjected to a deliberate imposition of substantial economic disadvantage as a defector, if he were deported; and that the uncontroverted expert testimony in the case shows that he would probably be subjected to imprisonment and, because of his killing of a Russian soldier in the Revolution of 1956, would, in all probability face, a sentence of death.

■ We have heretofore mentioned in this opinion that all of the essential grounds upon which the Board relied in the instant case to sustain the order of deportation were grounds which were disclaimed by the Board as a basis of its action as to one or another of the respondents in the Janus and Janek cases. At the time of the argument of the instant case, we did not have an opportunity to consider the Board's decision in Janus and Janek, which petitioner's counsel handed to the members of the court as a supplemental brief. After the filing by petitioner of the copy of the decision of the Board in Janus and

Janek, the Board, after the arguments, through its counsel filed in this court its supplemental brief in which it undertook to distinguish the instant case from what it termed "its opposite conclusions" in Janus and Janek. It was in this supplemental brief where the Board advanced its argument of the "gradual relaxation of restriction and harsh measures" imposed in Hungary, "which has been growing since the 1950s, has also been apparent in other communist countries, notably Yugoslavia"![7]—but that such "party line" was stronger in Czechoslovakia than in Hungary, and that one of the controlling factors that "justifies the different results reached by the Board" in the Janek case and in the Berdo case, is that "Janek is a Czech, and Berdo is an Hungarian." We have disposed of these contentions as being without merit. The Board also says in its supplemental brief that "although both Jaroslav Janek and Berdo joined the Party with a view to obtaining better employment, the Board might have considered Jaroslav's membership came much closer to being involuntary than Berdo's did." The controlling factor is whether Berdo's membership in the Communist Party was or was not *devoid of political implication*, and whether there was evidence that Berdo's association with the Communist Party was "*a meaningful association*."

The Board, in its supplemental brief, says that Berdo was only an unimportant member of the Communist Party. His own testimony shows that after being badgered for years by Party officials who controlled his employment and his chance to move from a stable to

7. The United States has been furnishing assistance to Yugoslavia on the basis that that country is independent of control by the Soviet Union; that it is not participating in any policy or program for the Communist Control of the world, and that it is in the interest of the United States to continue the furnishing of assistance to Yugoslavia. See P.L. 726, United States Statutes at Large, Vol. 70, p. 556, 84th Congress, 2nd Session, 1956; P.L. 85–141, United States Statutes at Large, Vol. 71, p. 356, 85th Congress, 1st Session, 1957; U.S.Code, Congressional and Administrative News, 85th Congress, 1st Session, Vol. 2, p. 1485. See also Department of State Announcement concerning modification of Restrictions on Military Aid to Yugoslavia, consonant with decision of the President to furnish aid to Yugoslavia in the matter of military assistance, of jet planes, and other various military items, May 14, 1957. Department of State Bulletin, v. 36 (June 10, 1957) pp. 939, 940.

more livable quarters, he became associated only to improve his degraded economic condition and the opportunity for his wife, his child and himself to leave the stable which Dr. Fekete described as "completely unfit for human habitation."

■ To establish that an alien was a member of the Communist Party within the meaning of Section 212 of the Act, the government has the burden of establishing by substantial evidence that the alien had consciously committed himself to the Communist Party by entering into an affiliation with it which had political implications. Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911.

In Rowoldt v. Perfetto, 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140, the Court held that where the only evidentiary support for the order for petitioner's deportation was his own testimony that he joined the Communist Party, paid dues, attended meetings, worked in a Communist bookstore, and terminated his membership after a year, it appeared that the dominating impulse of his affiliation with the Party was devoid of any political implications, and the record establishing the membership was not the meaningful association required by the Act to support an order of deportation.

In Gastelum-Quinones v. Kennedy, 374 U.S. 469, 479, 83 S.Ct. 1819, 1824, 10 L.Ed.2d 1013, the Court declared:

"[D]eportation is a drastic sanction, one which can destroy lives and disrupt families, and that a holding of deportability must therefore be premised upon evidence of 'meaningful association'."

In the Matter of Paul, Int. Dec. #1315, 10 I&N, Dec. 431, the holding of the Board is set forth in the headnote:

"[T]o sustain a charge of deportability under Section 214(a) (6), Immigration and Nationality Act, the ultimate burden of proof rests with, and requires, the Government to overcome the possibility that membership in the Communist Party was devoid of political implications, since unexplained voluntary membership and activity therein over a period of time does not justify an inference of awareness of the political nature thereof."

There was no evidence that Berdo's membership was a meaningful association, but rather the evidence was plain that his membership was devoid of political implication.

In its main brief, the Board insists that the question is not the deportability of Berdo, but his exclusion, and that one cannot turn a determination proceeding based upon exclusion principles into one based on deportation principles. However, in its supplemental brief, it states that in *Janus* and *Janek, supra*, the Board found that Frantisek Janus had never belonged to the Communist Party, was admissible to this country, and that his application for relief from deportation merited favorable consideration from the Board, although Frantisek had overstayed his allowed time as a non-immigrant visitor, and remained in this country without any authority although the Special Inquiry Officer had ordered him deported. This seems very much like the instant Berdo case, where the Board insisted in its main brief that one could not turn a deportation based on exclusion principles into one based on deportation principles. However, after the copy of the decision of the Board in Janus and Janek had been filed as a supplemental brief by petitioner, the Board filed its supplemental brief to distinguish Berdo from Janus and Janek, and declared that the Frantisek Janus case was distinguishable from Berdo because Frantisek had not belonged to the Communist Party and, therefore, found that he merited favorable consideration and the Board granted him permanent-resident status. As to Berdo, counsel on appeal for the Board says:

"If Berdo had not been a member of the Party, it is quite likely that the Special Inquiry Officer would have granted his Section 245 application [for permanent resident status]."

But if Berdo's membership had no political implication—or "was devoid of

political implications," and there was no evidence of meaningful association, which there was not, certainly he should not be deported on the ground that he was a member of the Party, in the light of the Supreme Court decisions above mentioned, which hold that deportability must be premised upon evidence of meaningful association. Under these cases, Berdo is entitled to the same treatment as Frantisek Janus, who was granted permanent-resident status, since Berdo, whose membership was devoid of political implications and meaningful association, was, under the law, no more a member of the Communist Party than was Frantisek Janus.

In the Board's supplemental brief, it is also stated, as a matter of importance, that the "record in Janek's case also contains a letter * * * from the Department of State to the District Director at New York, stating that on the basis of the information in Janek's file, that Department did not favor his deportation to Czechoslovakia." The Department of State might well have, as far as we can see, informed the Immigration and Naturalization Service that it did not favor the deportation of Berdo, since he was a Freedom Fighter who, in a pitched battle with the Russians in Budapest, had killed a Russian soldier; that Dr. Fekete had given as his expert opinion that Berdo would be subject to severe penalties of crimes, including this crime of not only refusing to return to Hungary, but the crime of murder committed by killing a Soviet soldier during the Hungarian Uprising; and that his association with the Communist Party was devoid of all political implication and meaningful association. However, the Board states that the "Immigration Service's Trial Attorney in Berdo's case considered requesting an opinion from the Department of State, but determined that the record did not necessitate such a special opinion." While we hold the Department of State in highest esteem, we do not see that on this appeal its special opinion would here be binding; but, if it had been asked for its opinion by the Trial Attorney for the Service, we have every reason to believe, from what has been set forth, that it would not have favored Berdo's deportation; and from what is stated in the Board's supplemental brief, it is probable that the Board would not have ordered Berdo deported, but would have determined his case as it did in Janus and Janek.

Under Berdo's uncontroverted testimony as well as that of Dr. Fekete, and the undisputed evidence in the case, and under the Supreme Court decisions of Galvan v. Press, Rowoldt v. Perfetto, Gastelum-Quinones v. Kennedy, *supra*, as well as the Board's decision in Janus and Janek, Berdo is entitled to the granting of his petition.

In accordance with the foregoing, the order of deportation is reversed and the case remanded for reconsideration in compliance with the views expressed in this opinion.